342 P.2d 1094

Asie J. WEBB, Plaintiff and Respondent,

v.

OLIN MATHIESON CHEMICAL CORPORATION, Defendant and Appellant.

No. 8872.

Supreme Court of Utah.

Aug. 12, 1959.

Ray, Quinney & Nebeker, Marvin J. Bertoch, Salt Lake City, for appellant.

Pugsley, Hayes, Rampton & Watkiss, Salt Lake City, for respondent.

CROCKETT, Chief Justice.

An explosion of plaintiff's rifle he was firing while rabbit hunting blew off part of his one finger and injured another. He sued defendant for negligence in manufacturing the gun. The case was tried and submitted to the jury on the issues of negligence of the defendant and contributory negligence of the plaintiff. The jury found the issues in favor of the plaintiff, and judgment for $3,785.40 was entered thereon from which defendant appeals.

Defendant's fundamental attack is that there is no competent evidence of its negligence; and that the only reasonable deduction to be drawn from the evidence was that the mishap resulted from the plaintiff's own negligence, so the defendant was entitled to a directed verdict.

The defendant, Olin Mathieson Chemical Corporation, manufactures firearms under the well-known brand of Winchester. In March, 1955, plaintiff purchased from Al's Sporting Goods Store in Salt Lake City one of defendant's products, a model 70 Winchester rifle, caliber .220 swift. Complications plague this case because the plaintiff was not contented to use this gun, which is known for its high power and muzzle velocity, in its original form. He was a gun tinkerer and had to remodel it. A week or two after he bought it he had a Salt Lake gunsmith replace the barrel with one which would take a .25 caliber cartridge. The following spring he had a Reno gunsmith resize the bore of the barrel so that it would take a .270 caliber cartridge; and also had a new stock put on the gun.

The fact of critical importance is that the central portion of the gun, which the experts call the "receiver" was not changed. Our concern is with this receiver, which receives, handles and ejects the shells, because it was the "backfiring" of a cartridge which broke the top portion out of the receiver and injured the plaintiff's hand.

In the usual firing of a cartridge the receiver is not subjected to particularly heavy

pressure because this is borne by the cartridge casing and the chamber into which the cartridge fits in the base of the barrel. However, it is necessary that the receiver have adequate strength to guard against possible explosions backward because of the fact that occasionally a cartridge will rupture or "separate" at the base when it is fired, in which event the explosive force of the gas, produced by the exploding powder, comes backward into the rece♥ver. If the receiver is of the proper strength and quality of steel it holds this force and the gas escapes through small holes in the receiver designed for that purpose.

The negligence charged against the defendant is that the receiver was not of proper quality, so that when a cartridge did rupture, the explosion came backward into the receiver and shattered it, resulting in the injury to the plaintiff. He seeks recovery under the now well-established doctrine which imposes liability upon the manufacturer for injuries resulting from defects in such a product when it is used in accordance with its intended purpose.[1] The plaintiff having prevailed is entitled to have the evidence and every reasonable inference fairly to be drawn therefrom viewed in the light most favorable to him.[2]

Through witnesses who had made tests of the metal of the receiver, plaintiff produced evidence that the steel was faulty in three particulars: that it had too high a sulfur content; that the manganese content was not uniform throughout; and that it was harder than it should have been. In regard to thos♦ facts, Robert O. Kron, a metallurgical engineer, testified: that a high sulfur content tends to weaken steel; that the lack of uniformity in the manganese content makes it heterogeneous or spotty in its quality, instead of being uniform or homogeneous, as it should be; and that such spottiness provides focal points for possible fracture when the steel is subjected to stress. The evidence also showed that under what is known as the Rockwell Test this steel had a hardness of between 47 and 51, whereas, the hardness most suitable for this particular purpose is from 40 to 43. Mr. Kron gave his opinion that steel with the higher hardness is more brittle and thus more likely to fracture under stress.

Fundamental to defendant's attack upon plaintiff's case is the charge that the latter's witnesses were not properly qualified as experts and that their evidence was therefore not competent. Defendant urges that the testimony of its expert, Mr. Richard E. Morgan, admittedly well qualified by training and experience as a metallurgical engineer, should be controlling. He dis-

---

1. Hooper v. General Motors Corp., Utah, 260 P.2d 549; Hewitt v. General Tire & Rubber, 3 Utah 2d 354, 284 P.2d 471, citing authorities including the now fa-mous McPherson v. Buick, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696.

2. Page v. Federal Sec. Ins. Co., 8 Utah 2d 226, 332 P.2d 666.

agreed with the essential parts of plaintiff's evidence and doubted the accuracy of the tests made and the testimony given by the plaintiff's witnesses.

When the subject under consideration involves some aspect of science, art, trade, or learning about which the general knowledge of laymen is not sufficient to interpret and apply evidence accurately in the finding of facts and drawing conclusions, one who has acquired special knowledge of the subject through study or experience may be permitted to testify as an expert and give his opinions in regard to it.[3] Inherent in the position of the trial judge in the immediate control of the trial is the responsibility of passing upon whether the subject justifies expert testimony and the qualifications of the witness as to whether he can give sound and reliable help to the jury on it.

In view of the importance of the function entrusted to the expert witness, it is of great importance that the court carefully scrutinize his qualifications to guard against being led astray by the pseudo learned or charlatan who may purvey erroneous or too positive opinions without sound foundation. The practical exigencies of the situation make it necessary that the trial court be allowed considerable latitude of discretion in making such determination. His rulings in that regard should not be disturbed lightly, nor at all unless it clearly appears that he was in error in his judgment on the matter.

Conceded that defendant is correct in its claim that its expert witnesses had more formal education and training than some of those relied upon by the plaintiff, that is not the only basis for judging the reliability of testimony. Particularly, it is not the concern of this court on review. So long as there is reasonable basis shown to justify the trial court's permitting the witnesses to testify as experts, the testimony is allowed to come in as competent evidence. The qualifications of the witnesses then become one of the factors for the jury to consider in determining the weight to be given it. Without setting out the detail, it is sufficient to say that the showing made brought the question of the competency of plaintiff's witnesses within the realm of the discretion indulged the trial court in such matters. That being so, the evidence as above discussed provides a sufficient basis upon which reasonable minds could find that the defendant was negligent in the manufacture of the gun and that the faults resulting therefrom proximately caused plaintiff's injury.

The important aspect of the charge of contributory negligence is that plaintiff en-

---

3. Joseph v. W. H. Groves L. D. S. Hospital, 7 Utah 2d 39, 318 P.2d 330; 20 Am.Jur. 656.

Figure 1

larged the size of the extractor slot. This is a notch cut in the side of the base of the barrel to facilitate the extraction of the cartridge and its ejection from the gun after it is fired. Figure 1 below shows the slot in defendant's standard barrel: figure

Figure 2

2 shows the slot as plaintiff had it enlarged. It is obvious that the slot as plaintiff had it cut is wider than in defendant's standard barrel. However, due to the fact that the cartridge, when in place for firing, does not fit flush into the barrel, but protrudes slightly out into the beveled portion, there is dispute between the expert witnesses as

to whether cutting this slot removed support from the cartridge jacket and what causative effect it would have on an accident such as the instant one.

Defendant's contention as presented by its experts is that the enlargement of the extractor slot diminished the support to the side of the cartridge, making it easier for the cartridge to rupture; and that such larger opening permitted a more sudden surge of the explosion back into the receiver, causing it to break. Plaintiff claims that the width makes no difference for reasons explained below in discussing the testimony of his expert, Mr. Casull.

A critical point of dispute relates to the depth (length) of the respective slots. Mr. Morgan, the defendant's expert above referred to, whose qualifications are not questioned, testified that he had measured the depth of the extractor slot of plaintiff's gun with a micrometer and compared it with the defendant's standard Winchester and two other well-known makes: Remington and Springfield; that .147 of an inch of the cartridge is exposed in the Winchester and the Springfield; and .151 of an inch is exposed in the comparable Remington gun; but that in plaintiff's remodeled gun .186 of an inch is exposed. That amounts to .039 or about $\frac{1}{26}$ of an inch more than is exposed in the standard gun made by the defendant. Both Mr. Morgan and another similarly qualified expert for defendant, Mr. Speer, were of the

opinion that this modification of the extractor slot was sufficient to cause the accident.

On this point plaintiff's case rests upon the testimony of Mr. Joseph Casull. Defendant insists that he is not qualified as an expert and that his evidence is therefore incompetent, which would leave plaintiff's case without support. Mr. Casull's qualifications are these: He is the owner and operator of a garage in connection with which he has operated a sporting goods store for a number of years. He stated that he has constructed and worked with guns for 10 years; has experimented with the tempering of guns by heat treatments; has conducted numerous tests on firearms in studying to become proficient in their making; and is presently experimenting with and making cylinders for high-powered revolvers. While in fairness it must be conceded that he does not have the background of formal training of defendant's witnesses, what we have said above regarding expert testimony is pertinent here. The facts concerning his qualifications, and any limitations therein, were fully exposed before the jury, and they could take them into consideration in comparing his testimony with that of the other witnesses and determining the weight to be given it.

There is admittedly a point of critical concern about the testimony of Mr. Casull. He agreed on cross-examination that if the extractor slot of the gun was deeper (long-

284

er) more of the cartridge case would be exposed and thus increase the danger of it rupturing. There was no showing whether he actually measured the extractor slot as did Mr. Morgan. However, he had the two barrels in his hands and had examined them. He gave his opinion that there was no appreciable difference in the amount of exposure of the cartridge in defendant's standard barrel, figure 1, and that of the plaintiff's gun, figure 2. He explained this as follows: the base of the barrel is beveled inward for about ¼ inch, as will be noted in the photographs. When the cartridge is in firing position it does not fit flush against the chamber but protrudes out a short distance (about ⅛ inch) into this beveled area. The purpose of this is so the extractor mechanism at the end of the bolt can fit around the rim of the shell to extract it. Thus the end portion of the barrel, which is beveled inward, gives no support to the cartridge anyway, so the widening of the slot has no effect; in fact, it could be enlarged to remove a still larger portion of the beveled area without diminishing the support the chamber gives the cartridge. There is the further fact that taking the defendant's evidence, the additional exposure of the cartridge by lengthening the slot would only be .035 (thirty-five thousandths) of an inch greater than the standard Remington; and only .039 greater than the standard Winchester. The

negligible effect of this small increase in depth seems apparent when it is remembered that the slot runs around only a portion of the circumference of the barrel. Based upon the above explanation and his examination of the respective barrels, Mr. Casull gave his opinion that any increased exposure of the side of the cartridge was not a causative factor in the explosion.

Other evidence, which might be regarded as in accord with the plaintiff's theory and the opinion of Mr. Casull, is the testimony of Mr. Bliss Titus, a gunsmith of admitted qualifications, called by the defendant. In response to questions as to whether changing of the slot by plaintiff would cause this explosion if a cartridge ruptured, he answered: "Could be. Nobody could say, I don't think, and be honest, but it does take some support away. * *" And further: "* * * it is probably a factor." It is appreciated that this testimony is not necessarily binding upon the defendant, yet it is significant that one of its own experts appeared to doubt that the enlarged extractor slot was a causative factor. If it is only "probable" the jury would not be required to find such to be the fact; nor should it be so ruled as a matter of law, because there is no basis for saying the evidence preponderated that way.[4]

Finally, it is charged that plaintiff was guilty of contributory negligence in

4. See Alvarado v. Tucker, 2 Utah 2d 16, 268 P.2d 986.

connection with the shells he was using in that: (1) he reloaded old cartridge jackets, (2) did not use the proper powder, and (3) did not observe due care in reloading them. Defendant says that the cartridge would not have ruptured unless there were negligence in one of those particulars, and that consequently plaintiff should be deemed guilty of negligence under the doctrine of res ipsa loquitur. It urges that this doctrine is just as applicable to prove negligence against a plaintiff as it is against a defendant, with which we agree. However, its usual purpose is to establish a prima facie case of negligence when proof is not available as to what caused a mishap that ordinarily would not happen in the absence of negligence.[5] When such evidence is available it is not a means of proving negligence conclusively, nor as a matter of law.

The plaintiff himself qualified as an expert with respect to the loading of cartridges which he had done for many years. He had done technical work of that character for the U. S. Army at the Remington Arms Plant during World War II. He testified that it was common practice to reload standard shells as he did, and that he exercised due care in doing so. He also stated that the tolerance limit for such factory ammunition was 50,000 pounds pressure per square inch, whereas, the powder he used rated 45,000 to 48,000 pounds per square inch. This evidence joined issue by disputing the charge of negligence made by the defendant.

 There was a conflict in the evidence upon the issues, and they were properly submitted to the jury. It is the declared policy of this court to zealously protect the right of trial by jury and not to take issues from them and rule as a matter of law except in clear cases. This idea was well and clearly set forth by Justice Frick:

"* * * unless the question of negligence is free from doubt, the court cannot pass upon it as a question of law; * * * if * * * the court is in doubt whether reasonable men, * * might arrive at different conclusions, then this very doubt determines the question to be one of fact for the jury and not one of law for the court."[6]

Affirmed. Costs to respondent.

WADE and McDONOUGH, JJ., concur.

HENRIOD, Justice (dissenting).

A vital issue here is whether the jury acted reasonably in finding plaintiff free from contributory negligence. If we say it did act reasonably, it is difficult for this writer to imagine a case where a manufacturer would not have to respond to any

---

5. Wightman v. Mountain Fuel Supply, 5 Utah 2d 373, 302 P.2d 471.

6. Newton v. O. S. L. R. Co., 43 Utah 219, 134 P. 567, 570, as quoted in Stickle v. U. P. R. Co., Utah, 251 P.2d 867.

purchaser of its commodity where the latter takes the liberty of changing it, abusing it, remaking it and using it with unrecommended substandard parts or accessories not designed for its use, as an officious busybody aptly labeled by the main opinion as a "tinkerer," whose tinkering plagued the case with complications because he "was not contented to use this gun * * * in its original form." The decision here places a premium on such tinkering and upon the unorthodox use of a standard manufactured article in a manner, and with substituted foreign parts, never dreamed of, contemplated by, designed for or recommended by the manufacturer. It makes the manufacturer an absolute insurer.

It is no answer to say, as does the main opinion, that plaintiff "seeks recovery under the now well-established doctrine which imposes liability upon the manufacturer for injuries resulting from defects in such a product *when it is used in accordance with its intended purpose.*" In support, Hooper v. General Motors, Hewitt v. General Tires and McPherson v. Buick, are cited. None is in point, since none involved a commodity tampered with or altered, as here, by a tinkering purchaser. The quoted statement, as applied to this case, is most inaccurate, since it ignores the facts in urging or implying that the article here was "used in accordance with its intended purpose." The "intended purpose" in this case quite clearly was meant to contemplate a use of the rifle in its physical state at the time it was removed from the packing case, with recommended standard ammunition, and not as remanufactured and reassembled by a ballistic eccentric.

The main opinion repeats the trite aphorism that the "plaintiff * * * is entitled to have the evidence and every reasonable inference fairly to be drawn therefrom viewed in the light most favorable to him," to support what I believe to be an unrealistic conclusion. This easy out is no substitute for documentation of exactly *why* and *where* plaintiff acted reasonably. The opinion not only lacks such specificity, —it ignores an equally recognized rule that plaintiff is bound by the undisputed evidence. Here is the evidence which plaintiff cannot escape:

In March, 1955, plaintiff bought a nationally advertised, name-brand Winchester Model 70, .220 rifle. *He removed the standard barrel, replacing it with an abortive one of different size and caliber, made by an unknown local gunsmith,* whose genius or capability is not reflected in the record. With this hybrid substitute for the standard equipment, plaintiff was fortunate, nonetheless, to survive the firing of 150 to 200 rounds. Early in 1956, plaintiff's genius for disaffection from using the gun under normal, standard conditions, led him to seek and have another unknown Reno gunsmith *resize the barrel to accommodate a longer cartridge,* and *to place a new stock* on what, a year before, had been a standard, nationally advertized firing piece. At this junc-

ture only the middle of the original rifle remained factorywise. It is not quite clear why this portion of the firearm had not been replaced by the gunnery idiosyncracies of the plaintiff.

Plaintiff not only was a tinkerer, but a "handloader," obviously harboring an indisposition to use standard ammunition, and entertaining a bent for manufacturing his own unorthodox slugs. Such ammunition, undesigned for the gun he bought, and unknown in the market overt for use in the now newly calibrated, converted, blunderbuss, nonetheless was employed by plaintiff. After using these home-made, overstuffed, undesigned, unrecommended cartridges filled with faster-burning, more explosive and more highly pressured slugs than ever had been used before, his luck ran out after firing but two rounds. On the *third,* the middle of his rifle blew up, removing part of his finger which, I suggest, the defendant involuntarily purchased through the agency of what I consider to have been a wholly unreasonable jury.

Very little of the main opinion is devoted to what *plaintiff* did, *what happened,* or the nature or extent of *plaintiff's* freedom from negligence. The remainder is a highly technical discussion of *defendant's* negligence, based on highly disputatious opinion testimony given by experts, (one of whom, called by plaintiff, was a service station attendant by profession, not a gunsmith) a general dissertation on the proper place for expert testimony in the corpus juris, and an unnecessary tribute to the jury system.

As to any deification of the jury system, I do not consider it sacrilegious or irreverent to urge that apostasy is in order where the veniremen become heretical and kneel to worship the false god of unreason. I think this case calls for such an apostasy. I believe we should do something more than render lip service to a system just because it is a system, or espouse any concept or near concept that suggests the infallibility of juries.

In my opinion the wholly uncalled for, unreasonable, unauthorized and negligent transmutation of an article bearing the reputation of a well-known, national manufacturer into an instrument of danger, by one having a passion for flouting recommended operational and functional standards, points up an inescapable contributory negligence, that, as a matter of law, calls for denial of recovery.

If we cannot take hold of a case like this and give relief from such a misguided conclusion as was arrived at by the jury here, having to resort to generality and easy, convenient rules for affirmance, the function of judicial review, in my opinion, not only is impaired, but tends to inspire disrespect for the judiciary on the part of the average layman.

CALLISTER, J., concurs in the dissenting opinion of HENRIOD, J.