Sally SMITH et al., Plaintiffs-Appellants,

v.

CLAYTON AND LAMBERT MANUFAC-
TURING COMPANY, Defendant-
Appellee.

Marijene L. PEART et al.,
Plaintiffs-Appellants,

v.

CLAYTON AND LAMBERT MANUFAC-
TURING COMPANY, Defendant-
Appellee.

Nos. 73–1439, 73–1440.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Oct. 17, 1973.

Decided Dec. 17, 1973.

---

W. Eugene Hansen, Salt Lake City, Utah (Burton H. Harris, Logan, Utah, on the brief), for plaintiffs-appellants.

Stephen B. Nebeker, Salt Lake City, Utah (Paul S. Felt, Salt Lake City, Utah, on the brief), for defendant-appellee.

Before HILL, McWILLIAMS and BARRETT, Circuit Judges.

HILL, Circuit Judge.

This diversity action was brought to recover for the wrongful deaths of Quentin L. Peart and C. Dean Smith by their wives and children. Defendant-appellee is a silo manufacturing company in Buckner, Kentucky, which sold decedents an "oxygen free" grain silo. While decedents were in this grain silo, they were asphyxiated by carbon dioxide. The case was tried to a jury in Utah federal district court, and a verdict was returned for appellee. This appeal followed.

The evidence adduced at trial indicates that from March, 1969, until the date of their deaths on May 1, 1971, Quentin L. Peart (Quentin) and his son-in-law C. Dean Smith (Dean) were owners and operators of the Bridgerland Dairy in Richmond, Utah. In 1969 the decedents purchased two large metal silos, one for storing high moisture hay such as alfalfa and the other for storing high moisture grains. Both silos were designed and manufactured by appellee, Clayton and Lambert Manufacturing Company.

The silos operated on the principle that high moisture hay and grains can be stored without spoilage if stored inside an airtight container. After the material is stored and sealed, a fermentation process begins which consumes oxygen and gives off other gases such as carbon dioxide. Once sufficient oxygen inside the silo has been consumed by this process, spoilage ceases.

The hay silo stands 60 feet high and is 20 feet in diameter. The grain silo in which the men died stands 21 feet high and is 20 feet in diameter. Located every five feet up the side of these silos are large, resealable steel doors which provide access to the feed or the loading/unloading machinery at the top of the silage.

Located on the bottom doors and the roof hatches of the two silos are warning statements. The warning on the hay silo reads:

### DANGER TO LIFE

Do NOT enter before completely ventilating silo. Do NO work in silo without adequate, continuous ventilation. Ensiling consumes oxygen and produces carbon dioxide and other gases. Such gases or insufficient oxygen may cause illness or death.

The signs on the silo in which the men were killed (the grain silo) read:

### DANGER TO LIFE

Do not enter before completely ventilating this oxygen-free silo.

About 7:00 p. m. on May 1, 1971, Quentin told his wife that he and Dean were having problems with the silo equipment. When the men failed to return from the silos by 9:00 p. m., Mrs. Peart became worried. She drove down to the silos but was unable to find them; so she called a neighbor, Howard Anderson, for help. Anderson, after noticing the second to the lowest door on the grain silo was open, climbed up to the entrance, and with the aid of a flash-

light saw the decedents' bodies lying on the grain.

Although there were no witnesses to this accident, we can infer from the circumstances that moist grain in the silo had bridged over the auger, thus preventing grain from falling down into the auger. Apparently Dean crawled into the silo with a pitchfork to pry loose the bridged-over grain, and was overcome by the carbon dioxide gas. When Quentin noticed something was wrong, he entered the silo to rescue Dean and was also overcome by the poisonous gas. The second door was probably used for their entrance because the bottom rung of the ladder leading to the top of the silo was bent over, making it impossible to open the lowest door without first bending out this bottom rung.

At trial appellants presented their case on two theories, strict liability and negligence. Their case included the following pertinent evidence. Dr. James T. Weston, chief medical examiner for the State of Utah, testified as to the effects of carbon dioxide upon the human body. Dr. Weston's testimony was that lack of oxygen causes dizziness and lightheadedness, and eventually causes a person to pass out. A concentration of carbon dioxide, on the other hand, associated with a decrease in oxygen, presents a more hazardous situation since the carbon dioxide in the blood returning to the lungs is not released but returns to the body and brain. This situation causes a person to pass out without any warning in as little as three or four breaths.

Randall Swanson, a farm safety expert, testified that in his opinion the warnings on the two silos were insufficient because the signs merely warn of danger rather than explain to the operator how to avoid this danger. He testified that appellee's warnings did not explain what "completely ventilating" meant, nor did they instruct how the ventilation is performed.

There was testimony from a ventilation expert to the effect that a moist grain silo could be properly ventilated by installing an inexpensive blow-fan. Whenever the silo needed to be entered, the fan could be turned on, thereby speeding up the ventilation and reducing the hazard of carbon dioxide consumption.

Appellee's case included the testimony of Laurie Rautio, president of Clayton and Lambert Manufacturing Company. Rautio testified that the silos' warning signs are designed to catch a person's attention. The signs are written with simple language that is understandable to everyone, and are brief enough to assure complete reading. Rautio also stated that no definition of "ventilation" is included because that word is common knowledge among farmers. When asked how a farmer can determine what constitutes sufficient ventilation, Rautio indicated the generally accepted method is to place your head inside the silo; if there is an acid odor associated with the ensiling process which stings the eyes, nose and throat, then proper ventilation has not yet occurred.

Appellee's ventilation expert, Dr. Joseph Ross, testified that the concentration of gas, the temperature and the humidity all affect the ventilation process and that to date no acceptable device for testing carbon dioxide density has been put on the market. Thus the common method is to use natural ventilation by opening the top hatch and a lower door. Gases inside the silo which are warmer than the outside air are lighter and rise through the top hatch, while inside gases which are colder than the outside air flow through the lower door. Dr. Ross also testified that the combination of carbon dioxide and water inside the silo forms carbonic acid which would freeze the motor of any fan mounted inside the silo.

Other evidence introduced at trial indicated both decedents knew the silos had to be properly ventilated before entering. They had worked around the silos daily and had ventilated them on other occasions. In fact, Quentin on one occasion entered the hay silo before

properly ventilating it and had to be helped out after the carbon dioxide made him dizzy. After the incident occurred, a salesman for appellee's silos read Quentin a newspaper article about a similar incident happening near Delta, Utah, to impress upon him the importance of ventilating a silo before entering. Dean, who was the chemistry teacher at Skyview High School, once told his wife the silos must be properly ventilated. On another occasion he explained to a fellow teacher that to properly ventilate the silos a door or window must be opened to allow the ingress of oxygen.

Appellants' position is that appellee was strictly liable for designing, manufacturing, testing and inspecting the grain tank and placing it in the flow of commerce in a dangerous and defective condition. They also assert that appellee is strictly liable for failing to adequately warn and instruct purchasers of their product as to the inherent dangers in using the equipment and in failing to adequently explain what procedures should be taken to make the product safe. Appellants' second theory of liability, negligence, is founded on the same grounds as strict liability except ordinary negligence is substituted as the basis for recovery.

At the conclusion of the trial, the jury was instructed on strict liability alone.

As a defense to strict liability, the jury was instructed that if decedents knew of the danger and freely and voluntarily consented' to assume it, then appellants were not entitled to recover.[1] The jury, after hearing all the evidence and instructions returned a verdict for appellee manufacturing company.

On appeal five issues are presented for our consideration: First, that under strict liability there can be no assumption of risk if the injury is foreseeable and preventable; second, that no evidence was introduced supporting a finding that decedents assumed the risk; third, that assumption of risk is not a defense to an allegation of failure to warn or failure to instruct; fourth, that if an assumption of risk theory is proper, the instruction must be directed to the particular risk assumed; and fifth, that the lower court should have instructed the jury on the theory of negligence as well as strict liability. We find all these issues to be without merit and accordingly affirm the jury verdict.

■ Appellant's first, second and third issues are interrelated and thus will be considered together. The first issue is that assumption of risk instructions should not have been allowed because the silos were so dangerous that appellee should have been required to make the product absolutely safe either

1. INSTRUCTION NO. 17. There is a legal principle commonly referred to by the term "assumption of risk." One is said to assume a risk when he voluntarily and unreasonably proceeds to encounter a known danger. The essential elements of assumption of risk are: First: Knowledge of the danger; and Second: A free and voluntary assent to assume it. One who has thus assumed a risk is not entitled to recover for the damage which results from the dangerous condition to which he has thus exposed himself.

If you find from a preponderance of the evidence that Quentin Peart assumed the risk, or as it applies to C. Dean Smith, that he assumed the risk, as that term has been defined in the preceding paragraph, and that such conduct on his part was a proximate cause of his death, then you should return a verdict in favor of the defendant and against the set of plaintiffs. . . .

INSTRUCTION NO. 18. In determining whether Quentin Peart or Dean Smith voluntarily assented to, or assumed, a risk so as to bar recovery of damages for injury, you may consider their age, experience and capacity, along with all the other surrounding circumstances as shown by the evidence, in determining whether Quentin Peart or Dean Smith knew and appreciated the risk involved.

INSTRUCTION NO. 19. Before assumption of risk will bar recovery, it must be voluntary. To be voluntary, these two factors must be present: First, the person in question must have full knowledge of the danger; Second, he must have freedom of choice. This freedom of choice must come from the circumstances that provide him a reasonable opportunity, without violating any legal or moral duty, to safely refuse to expose himself to the danger in question.

by providing equipment to assure proper ventilation or by supplying instructions on how the silos could be properly ventilated. Appellants' argument is that under strict liability appellee should be held absolutely liable regardless of decedents' knowledge of the dangerous condition.

As there has been no dispositive Utah Supreme Court decision on whether it would even accept the theory of strict liability, we must follow the commonly accepted rule that when state law is unsettled the views of the resident district judge carry extraordinarily persuasive force on appeal. Sade v. Northern Natural Gas Co., 483 F.2d 230 (10th Cir. 1973); Marken v. Goodall, 478 F.2d 1052 (10th Cir. 1973); Moomey v. Massey Ferguson, Inc., 429 F.2d 1184 (10th Cir. 1970). The district court held that Utah would apply strict liability in the instant case, and we have found nothing to convince us otherwise. After giving deference to the district court's decision on strict liability, we should also give deference to its decision to allow assumption of risk as an affirmative defense. Utah has adopted assumption of risk as an affirmative defense in other kinds of tort liability, and it is reasonable to assume it would also adopt it for strict liability. Harrop v. Beckman, 15 Utah 2d 78, 387 P.2d 554 (1963).

Once it is determined that assumption of risk is a proper defense to strict liability, appellants' second and third issues become questions for jury determination. Whether the evidence supported a finding that decedents assumed the risk by entering the unventilated silo and whether the appellee failed to warn or instruct decedents of the hazardous conditions are not for us to decide on appeal. As we have noted on other occasions, jury determinations are presumed correct and will not be preempted unless they are clearly against the weight of evidence. Jaeco Pump Co. v. Inject–O–Meter Mfg. Co., 467 F.2d 317 (10th Cir. 1972); Champion Home Builders v. Shumate, 388 F.2d 806 (10th Cir. 1967).

The evidence most favorable to appellee indicates that Quentin and Dean had ventilated the silos on other occasions. Quentin had been overcome by carbon dioxide once before, and had been warned of the dangers involved in using an oxygen free silo. Dean unquestionably understood the dangers of carbon dioxide and on occasion had explained to others the need for completely ventilating the silos. There was expert testimony that by opening up a roof hatch and a lower door the silo could be properly ventilated. Other evidence indicated that by smelling the ensilage odors one could determine when the silo was properly ventilated. Before Dean or Quentin opened the second door he had passed over a sign warning of danger to life if entering the silo before properly ventilating it. The Court of Appeals as a factfinder might have drawn a different conclusion, but there certainly is sufficient evidence to support the jury's determination. Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir. 1962).

■ Appellants next argue the lower court should have instructed the jury that before decedents could assume the risk they must have had knowledge of the particular risk they were assuming. In other words, it was not sufficient for decedents to know that high moisture oxygen free silos were dangerous; they must also have known that a high concentration of carbon dioxide will cause almost immediate unconsciousness, they must have known how to properly ventilate the silo, and they must have known when it was safe to enter the silo.

As noted previously, in Utah assumption of risk is an affirmative defense. If plaintiff knows, appreciates and has a reasonable opportunity to make an alternative choice, then the defense is available. Evans v. Stuart, 17 Utah 2d 308, 410 P.2d 999 (1966); Jacques v. Farrimond, 14 Utah 2d 166, 380 P.2d 133 (1963); Johnson v. Hartvigsen, 13 Utah 2d 322, 373 P.2d 908 (1962). In the in-

stant case the district court defined assumption of risk as (1) knowledge of the danger and (2) a free and voluntary consent to assume it. The district court explained that in determining whether Quentin or Dean voluntarily assumed the risk the jury could consider decedents' ages, experience and capacity along with all other surrounding circumstances which might show whether they knew or appreciated the risk involved. This instruction was sufficient for it allowed the jury to determine from the circumstances whether decedents knew the dangers of carbon dioxide, knew how to properly ventilate the silo, and knew when the silo could be entered safely.

Appellants' final argument is that the case should have been submitted to the jury on negligence as well as strict liability. It was the trial court's opinion that appellants' case was basically a products liability case—failure to properly design the silo and failure to warn of a known hazard. The trial judge was therefore concerned that instructing on both strict liability and on negligence, with their respective affirmative defenses of assumption of risk and contributory negligence, would cause unnecessary confusion of the jurors. We agree. There was no independent evidence submitted by appellants directed toward the theory of negligence alone. Appellants presented no evidence that appellee's silos were negligently manufactured, nor was there any evidence that the warning signs had been negligently constructed. On the contrary, the evidence shows the silos to have been manufactured as intended and the warning signs to have been written only after it was decided what warning would be most effective. Thus if there was any negligence, it related only to failure to properly design the silo or failure to warn of a known hazard, and it was adequately covered under the strict liability instructions. By instructing on strict liability, appellants were given the advantage of not having to show fault by appellee and not having to show a lack of contributory negligence on the part of decedents. To that extent, appellants' burden of proving liability was decreased. In this situation we cannot understand how appellants were prejudiced by the court's failure to instruct on ordinary negligence.

Affirmed.