601 P.2d 152 (1979)
ERNEST W. HAHN, INC., and Lester R. Giegerich, for and on behalf of Western Properties Co., a limited partnership as general partners of Fashion Place Associates, a limited partnership, for and on behalf of Fashion Place Associates, Plaintiff and Appellant,
v.
ARMCO STEEL COMPANY, a corporation, Defendant and Respondent.
No. 15258.
Supreme Court of Utah.
September 25, 1979.
*153 Alan L. Sullivan of Van Cott, Bagley, Cornwall & McCarthy, Wallace R. Lauchnor of Bayle & Lauchnor, John P. Ashton, of Prince, Yeates, Ward & Geldzahler, Salt Lake City, for plaintiff and appellant.
Glenn C. Hanni of Strong & Hanni, Salt Lake City, for defendant and respondent.
WILKINS, Justice:
This is a case for damages resulting from a partial collapse of the roof of a shopping mall, which at the time of the collapse had only been in operation approximately three months. The matter was tried before a jury in the District Court of Salt Lake County, which returned a special verdict finding the Defendant Armco Steel Company liable to the plaintiff, a limited partnership, under strict liability in tort, breach of implied warranty and negligence. The jury found that the plaintiff's general partner, who was also the mall's construction contractor, was contributorily negligent. The jury found damages in the sum of $857,940. The District Court entered a judgment on the special verdict in favor of the defendant and against the plaintiff, no cause of action. The court thereafter denied plaintiff's motion for entry of judgment on special verdict, or in the alternative for judgment n.o.v., or in the alternative for a new trial. Plaintiff appeals from the judgment entered below and from the order denying its motions.
Plaintiff, Fashion Place Associates, is a limited partnership wherein Ernest W. Hahn, Inc., a California corporation, and Western Properties Co., a limited partnership of Connecticut, are the general partners. Fashion Place Associates was formed to develop and operate a regional shopping center to be located in Murray, Utah. Plaintiff contracted with its general partner Ernest W. Hahn, Inc. ("Hahn") whereby Hahn agreed to furnish the necessary labor and materials for construction of the shopping center. Hahn subcontracted with Western Steel Company ("Western Steel") for Western Steel to perform all structural steel work for the shopping center. Western Steel subcontracted with Steel Erection and Rigging Company ("Steel Erection") for Steel Erection to do the actual erection of the structural steel. Western Steel also subcontracted with defendant to manufacture and sell to Western Steel the steel joists incorporated into the structural steel roof.
Plaintiff hired Leach, Cleveland and Associates ("Leach") to design the prepare plans and specifications for the development and construction of the shopping center. Leach, in turn, hired Samuel Schultz, Inc. ("Schultz") to serve as the structural engineer for the project and to do the actual designing of the structural steel system.
Plaintiff originally named as defendants Hahn, Leach, Schultz, Western Steel, Steel Erection and the named defendant here. *154 Hahn subsequently moved to dismiss itself on the ground that plaintiff and Hahn were one and the same entity and therefore there was no justiciable controversy between them. This motion was granted and the complaint was dismissed as to Hahn. Thereafter, all of the then defendants with the exception of the named defendant settled before trial. At trial, the jury was advised, pursuant to stipulation, that other parties had been originally joined as defendant and that settlement had been made between them and plaintiff in the sum of $825,000.
The Fashion Place Mall was substantially completed in October, 1972, and opened for business at that time. Much of the completed area was leased to tenants who operated retail stores. The janitor at Fashion Place Mall testified that at about 2:00 a.m. on December 29, 1972, he heard a loud crash inside the mall. About a half hour after this initial crash he began to hear popping noises which increased in intensity and frequency until 7:38 a.m. when a substantial portion of the mall roof collapsed. The collapse occurred during the heaviest snowstorm on record for a 24-hour period in the Salt Lake Valley. Approximately 20-22 inches of snow fell in the Murray City area, which encompasses the mall location, from 1:00 p.m., December 28, 1972, to 1:00 p.m., December 29, 1972.
After the collapse Murray City hired a structural engineer to determine the cause of the collapse, to ensure integrity of the non-collapsed area of the mall, and to supervise remedial measures considered necessary. He determined that the mall was unsafe and had it closed until the structure could be strengthened by performing additional welding and other remedial measures. The structural steel system of the mall consisted of rows of tapered steel plate girders, both ends of which rested on top of long steel pipe columns. Short-span steel bar joists spanned between these rows of girders and were welded to the top flange of the girders. Corrugated steel decking was welded to the top chords of the steel bar joists, and the light-weight concrete fill was bonded to the top of the steel decking. Over this lightweight concrete was a layer of insulation and finally the roofing material itself.
Several engineering experts examined the site to determine the cause of the collapse. The experts disagreed as to its exact cause, and the causation problem monopolized the trial. Nine expert witnesses testified at trial, and the testimony showed that the roof collapse and the consequent damages could have had more than one proximate cause. These causes included: faulty structural design or construction (1) in that there should have been stiffeners or other lateral support at the tops of the columns to prevent the girders from buckling. (In addition, testimony was elicited that the Fashion Place Mall was designed to carry only a 20-pound per square foot live load, and that it was the practice of engineers in Salt Lake City County to design structures for a 30-pound per square foot live load,[1] and that the snow load on the collapsed portion was about 17-pounds per square foot); (2) as joists in the collapsed area were installed on a slope, shims or tilted bearing plates should have been installed to provide a more uniform bearing on the girder; (3) in that many of the columns and girders in the non-collapsed area were not plumb, (this problem reduced the load carrying capabilities of the girders); (4) because excessive concrete was poured to level the roof (adding extra weight), in response to a problem created by a column in the collapsed area having been erected 8-10 inches too short; and (5) as defective welds were made on the lower connection of the end diagonal (the W-1 bar) of the defendant's bar joists.
Specifically, Murray City's expert, Mr. Coon, testified that the collapse was caused by faulty welds on the end diagonal connection of the bar joists. Defendant's experts admitted that those welds were not of the *155 quality they would expect. Evidence disclosed that once a weld has been painted, there is apparently no reliable way to test its quality. This being so, Mr. Coon required plaintiff to re-weld all of the end diagonal connections on every bar joist in the mall. Additionally, Mr. Coon required that stiffeners be welded into the unframed web endings of the tapered girders to correct what he considered to be a design defect.[2]
Plaintiff prayed for relief for damages incurred in the restoration of the collapsed area, for remedial measures required by Murray City in the non-collapsed area of the mall, for lost amounts claimed by the tenants while the building was closed, and for the lost income from the tenants during that time. The parties stipulated that if witnesses were called to testify, they would testify that plaintiff incurred losses in the amount of $1,493,947.20. Plaintiff presented evidence as to an additional $84,417.79, thus bringing plaintiff's claim to $1,578,364.99.[3]
The jury was asked to determine what sum would compensate plaintiff for damages sustained as a result of the acts of defendant. The jury, in its special verdict, found the sum to be $857,940.00. The District Court, however, entered a judgment in favor of the defendant and against the plaintiff, no cause of action. The damages will be discussed more thoroughly, infra.
Plaintiff raises three main issues on appeal: first, the District Court erred in holding that contributory negligence is a defense to strict liability and to breach of implied warranty and in entering a judgment of no cause of action; second, the Court improperly instructed the jury on the issue of plaintiff's negligence; and third, the Court erred in denying plaintiff's motion for entry of judgment on this special verdict for $857,940.00.

STRICT PRODUCTS LIABILITY AND BREACH OF IMPLIED WARRANTY
At trial the jury found that the defendant was negligent, that it was strictly liable to the plaintiff, and that it had breached its implied warranty to the plaintiff, that in all of these matters there was proximate cause, and that defendant was liable in damages to plaintiff. The jury also found that the plaintiff was contributorily negligent and *156 that plaintiff's negligence was also a proximate cause of its damage. On the basis of these findings the District Court ruled that plaintiff's contributory negligence barred its recovery on all three counts.
The law of strict products liability essentially began with MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916), in which the New York Court of Appeals held the manufacturer of an automobile liable to the driver for his injuries sustained when the vehicle's wheel collapsed because the wheel had been made with defective wood. The MacPherson case mandated that a manufacturer of a product is liable to a subsequent user even in the absence of privity between the manufacturer and the user if the product is negligently made and of the type which would "place life and limb in peril when negligently made." Id., 111 N.E. at 1053. Many states adopted the MacPherson rule, as did Utah in Hooper v. General Motors Corp., 123 Utah 515, 260 P.2d 549 (1953).
In 1959, when addressed with a products liability case in Webb v. Olin Mathieson Chemical Corporation, 9 Utah 2d 275, 342 P.2d 1094 (1959), this Court referred to the MacPherson doctrine in upholding the plaintiff's theory of recovery for injuries sustained from defects in a gun manufactured by the defendant. The evidence reviewed in Webb did not disclose any negligence on the part of the defendant in the manufacture of the product. Nevertheless, plaintiff sought recovery "under the now well-established doctrine which imposes liability upon the manufacturer for injuries resulting from defects in such a product when it is used in accordance with its intended purpose." Id., 342 P.2d at 1096.
Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1962), was the benchmark for the law of strict products liability by holding that the
manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. Id., 27 Cal. Rptr. at 700, 377 P.2d at 900.
In speaking for the California Supreme Court, Justice Traynor reasoned that strict products liability should be adopted, commenting:
... to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. Id., 27 Cal. Rptr. at 701, 377 P.2d at 901.
In 1965, Section 402A, the Restatement (Second) of Torts ("Sec. 402A") adopted the Greenman rule, and reads as follows:
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
An able historical development of tort law leading up to strict liability is given in the majority opinion in Daly v. General Motors Corp., 20 Cal.3d 725, 144 Cal. Rptr. 380, 383-384, 575 P.2d 1162, 1165-1166 (1978) where it states, inter alia:
... Tort law has evolved from a legal obligation initially imposed without "fault," to recovery which, generally, was based on blameworthiness in a moral sense. For reasons of social policy and because of the unusual nature of defendants' acts, liability without fault continued to be prescribed in a certain restricted area, for example, upon keepers of wild animals, or those who handled explosives *157 or other dangerous substances, or who engaged in ultrahazardous activities. Simultaneously, and more particularly, those who were injured in the use of personal property were permitted recovery on a contract theory if they were the purchasers of the chattel or were in privity. Subsequently, liability was imposed in negligence upon the manufacturer of personalty in favor of the general consumer... . Evolving social policies designed to protect the ultimate consumer soon prompted the extension of legal responsibility beyond negligence to express or implied warranty... . Warranty actions, however, contained their own inherent limitations requiring a precedent notice to the vender of a breach of the warranty, and absolving him from loss if he had issued an adequate disclaimer.
General dissatisfaction continued with the conceptual limitations which traditional tort and contract doctrines placed upon the consumers and users of manufactured products, this at a time when mass production of an almost infinite variety of goods and products was responding to a myriad of ever-changing societal demands stimulated by wide-spread commercial advertising. From an historic combination of economic and sociological forces was born the doctrine of strict liability in tort.
We, ourselves, were perhaps the first court to give the new principle judicial sanction. In Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, ... we fastened strict liability on a manufacturer who placed on the market a defective product even though both privity and notice of breach of warranty were lacking. We rejected both contract and warranty theories, express or implied, as the basis for liability. Strict liability, we said, did not rest on a consensual foundation but, rather, on one created by law. The liability was created judicially because of the economic and social need for the protection of consumers in an increasingly complex and mechanized society, and because of the limitations in the negligence and warranty remedies. Our avowed purpose was "to insure that the costs of injuries resulting from defective products are borne by the manufacturer that put such products on the market rather than by the injured persons who are powerless to protect themselves." ... Subsequently, the Greenman principle was incorporated in section 402A of the Restatement Second of Torts, and adopted by a majority of American jurisdictions.
From its inception, however, strict liability has never been, and is not now, absolute liability. As has been repeatedly expressed, under strict liability the manufacturer does not thereby become the insurer of the safety of the product's user... . As will thus be seen, the concept of strict products liability was created and shaped judicially. In its evolution, the doctrinal encumbrances of contract and warranty, and the traditional elements of negligence, were stripped from the remedy, and a new tort emerged which extended liability for defective product design and manufacture beyond negligence but short of absolute liability. [Emphasis in original; most citations omitted.]
Since Greenman, this Court has had little contact with the strict products liability concept.[4] In Simpson v. General Motors Corporation, 24 Utah 2d 301, 470 P.2d 399 (1970), and Parker v. General Motors Corporation, 28 Utah 2d 385, 503 P.2d 148 (1972), we declined to review strict products liability because the issue was not properly before the Court. Finally, in Perkins v. FitWell Artificial Limb Co., 30 Utah 2d 151, *158 514 P.2d 811 (1973), without expressly adopting strict products liability, this Court applied its logic, indicating that assumption of the risk (in this case, the use of a defective crutch by one who knew of the defect) is a defense to it.
When the user of a defective product knows, or in the exercise of ordinary care should know, of the defect in a product and of the danger inherent therein, the doctrine of strict liability in tort should not apply to harm occurring to the purchaser after such knowledge. Id., 514 P.2d at 812, 813.
The instant case presents an appropriate opportunity for us to adopt the strict products liability doctrine and we do so in the language of Section 402A, noted ante.
Defendant mass-produced the joists and made the defective welds in its own plant, and when the defendant painted the welds there was no reliable way of testing their quality.
There is credible, substantial evidence in this record, which the jury chose to believe, that defendant sold products in this case in a defective condition unreasonably dangerous to plaintiff; that defendant engaged in the business of selling such products, which reached plaintiff without substantial change from the time they left defendant; and that these products caused physical harm to plaintiff and its property.
Was there, then, a valid defense to strict liability here? The District Court ruled that plaintiff's contributory negligence was a defense to the strict liability, implied warranty, and negligence actions. We do not address the matter of defendant's negligence, nor the matter of plaintiff's contributory negligence as it relates to defendant's negligence, as the counts sounding in strict liability and implied warranty are dispositive in this case.
Defendant claims that the contributory negligence consisted of Hahn's erecting the structure of the mall in a negligent manner  girders and columns were out of plumb and there was a lack of shims under the joists  and that Hahn's negligence was imputed to plaintiff; that plaintiff's contributory negligence also consisted of its failure to hire inspectors to observe this negligently erected structure; and that these negligent acts also caused the roof collapse. Defendant does not claim, as noted in its brief, that this is a case where "... plaintiff failed to discover a defect in Armco's bar joists, nor a case where plaintiff discovered the defect and proceeded unreasonably to use the product in the face of a known danger... ."
We hold there are two defenses to strict products liability, namely, (1) misuse of the product by the user or consumer (see comment "g" to Sec. 402A);[5] and (2) knowledge of the defect by the user or consumer, who is aware of the danger and yet unreasonably proceeds to make use of the product, i.e., assumption of risk. (See comment "n" to Sec. 402A).[6] And we further hold that the defenses of misuse and assumption of risk must relate to the defective product and cannot be extended to cover conduct by the user or consumer unrelated to that product.
We need not  and do not  reach the issue here, because of the unavailability to defendant of either of these two defenses, *159 of whether comparative principles[7] should apply in strict products liability cases, where one of these two defenses lies, in order to diminish recovery by plaintiff, or whether proof by defendant of one of these two defenses bars recovery altogether.[8]
The jury also found defendant had breached its implied warranty of merchantability to the plaintiff and that such breach proximately caused plaintiff damage. The elements of both actions are essentially the same[9] and analysis for the purpose of determining defenses to breach of implied warranty parallels that for strict products liability. Therefore, the same defenses discussed under strict products liability are available under breach of implied warranty.

TRIAL COURT'S INSTRUCTIONS
At trial, the Court instructed the jury:
You are instructed that Ernest W. Hahn, Inc., the contractor on the Fashion Place Mall project, and the plaintiff, Ernest W. Hahn, Inc., for and on behalf of Fashion Place Associates, are one and the same entity, and that the negligence of the contractor, Ernest W. Hahn, Inc., if any, is the negligence of the plaintiff.
Ernest W. Hahn, Inc., served as both general partner of the limited partnership, Fashion Place Associates, and as construction contractor of the project. When suit was filed in December, 1973, the complaint designated the plaintiff only as "Fashion Place Associates, a Limited Partnership." The pleadings were later amended to include Hahn, acting for and on behalf of the limited partnership. The other general partner, Lester R. Giegerich, for and on behalf of Western Properties Co., a limited partnership, acquired its interest in Fashion Place Associates after the collapse; and this general partner's name did not appear on the pleadings until 1975.
Plaintiff now claims that this instruction was erroneous as a matter of fact and of law. In view of our holding as to available defenses to strict products liability in this jurisdiction, and their non-application in this case, however, it matters not whether Hahn's alleged negligence is the negligence of plaintiff. Hence, we do not reach this claim of error.

TRIAL COURT'S DENIAL OF PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT ON SPECIAL VERDICT
The parties stipulated if witnesses were called to testify they would testify that plaintiff incurred expenses of $1,493,947.27 and that these expenses were reasonable (later in the trial, as shown in note 3, ante, defendant agreed that $470,000.00 of this figure was reasonable and necessary). Plaintiff also presented evidence of an additional $84,417.50, bringing the total damages before the Court of $1,578,364.99. The jury was instructed that other original defendants had settled before trial and paid to the plaintiff $825,000.00. It was then instructed to calculate all of the damages caused by defendant's defective product, and that the Court would make the deduction to offset the award already received in settlement.
The jury returned to the Court special verdict no. 10 filled out as follows (the figure of $825,000.00 having been typed in on this verdict with approval of the parties prior to submission to the jury):
What sum would fairly compensate the plaintiff for the damages, if any, sustained as a result of the acts of Armco Steel Company?

*160
A. Damages for Tenant
 Claims $235,000.00
B. Damages for Lost Income
 to Plaintiff $ 75,836.00
C. Other Damages $547,104.00
 ___________
 TOTAL DAMAGES $857,940.00
 Less Amounts Received
 in Settlement $825,000.00
 ___________
 NET DAMAGES $
 -----------

The jury, as it was instructed, made a specific finding regarding the total damages that the plaintiff sustained as a result of the acts (defective products) of the defendant. Plaintiff contends on appeal that because the jury did not actually make the calculation deducting the $825,000.00 received in settlement from the $857,940.00 total damages, that they did not intend the deduction to be made.
There appears to be some minor confusion in the instructions relating to damages on whether the total damages sustained by plaintiff should be ascertained by the jury or whether the damages sustained as a result of the acts (defective products) of defendant should be determined. And certainly, on its face, the information revealed to the jury of the amount of prior settlement of $825,000.00 would seem to intensify this problem (though the jury was instructed that that settlement should be of no concern to it).
But, this seeming confusion did not affect the jury. Why? Because the jury assessed damages for $857,940.00  with mathematical precision  on the basis of apportionment of damages which related to the acts of defendant only, as it was encouraged to do by defense counsel in its summation, and as it was instructed to do in the special verdict. Specifically, this counsel, in summation, substantially urged, repeatedly, that if the jury found defendant liable, it should assess damages for only one-half of the damages sustained, which it did with the exception of damages shown on invoice no. 6519-C, which related to one item, the rewelding of the joists heretofore mentioned, and originally welded by defendant solely, in the sum of $137,516.95. The apportionment can be strikingly illustrated:

 Total damages $1,578,364.99
 Less invoice no. 6519-C - 137,516.95
 _____________
 $1,440,848.04
 Divided in half $ 720,424.02
 Add invoice no. 6519-C + 137,516.95
 _____________
 $ 857,940.97

The jury rounded of the finding against defendant to $857,940.00.
The Court, after receiving the verdict, denied plaintiff's motion for entry of judgment against defendant for $857,940.00 without settlement already received of $825,000.00 but entered judgment for $32,940.00  the difference between these two amounts. The Court then later entered judgment against plaintiff, no cause of action.
We are mindful that this type of case may not classically lend itself to apportionment of harm among tortfeasors. But, significantly, the ascertainment of damages for harm caused by the defendant, not the total damages caused to plaintiff by all parties, dominated the rhythm and contours of this case overwhelmingly, though plaintiff's counsel, in summation, cautioned the jury against allocation of damages "... because if you do we (the plaintiff) are going to have a double deduction..."; i.e., if damages attributable only to defendant are assessed and then the Court deducts the settlement already paid by others, the plaintiff would indeed suffer a double deduction.
Hence, the law of the case to apportion was established by the damage instructions  with minor, but not fatal, tension existing among them  and the persistent urgence by defense counsel in summation. Coupling these matters with a demonstrated and irrefutable fact of apportionment by the jury and the substantiality of the evidence on damages, against which no serious argument can be made, we conclude that the verdict for $857,940.00 must be essentially upheld without diminution of settlement from it in this unique case. We say "essentially" as one adjustment must be made, which is necessary as the verdict amount of $857,940.00 added to the settlement sum for $825,000.00 equals $1,682,000.00, which exceeds the total damages *161 claimed by plaintiff. Hence, plaintiff can recover only the difference between the total damages of $1,578,364.99 less the settlement of $825,000.00.
Since Justice Cardozo commented that "The assault upon the citadel of privity is proceeding in these days apace,"[10] two-thirds of the American jurisdictions have adopted the doctrine of "strict liability in tort."[11] We now, by this opinion, fully and clearly join this large majority of jurisdictions in espousal of this doctrine.
Reversed and remanded with instruction to the District Court to enter judgment for plaintiff and against the defendant for $753,364.99, together with interest. Costs to plaintiff.
MAUGHAN, J., and ELLETT, Retired Justice,[*] concur.
CROCKETT, C.J., concurs in the result.
STEWART, J., does not participate herein.
HALL, Justice (dissenting):
I respectfully dissent.
My first concern is that the facts of this case do not warrant the application of the doctrine of strict liability. I am particularly concerned with the majority's decision as it relates to the narrow application of the defense of misuse, viz., that the misuse must directly relate to the defect in the product. It is my opinion that whenever a product's use cannot be reasonably foreseen by the manufacturer and that such use is a proximate cause of plaintiff's injuries, the case is not one of strict liability. In the instant case, Armco could not have foreseen that the joists would be negligently installed, and the defense of misuse should therefore be available.[1]
The case before us is basically one involving the negligence of various parties and multiple proximate causes.[2] There is no need to concern ourselves with the doctrine of strict liability in this case because the jury specifically found that Armco was negligent in fabricating the steel joists with defective welds and that such negligence was a proximate cause of the roof collapse.[3] However, the jury also found that Hahn (the contractor) was contributorily negligent and that such was also a proximate cause of the roof collapse.
The record does not disclose whether the trial judge (in setting aside the jury verdict) actually applied the doctrine of strict liability, and then erroneously concluded that contributory negligence was a defense thereto, or whether he simply applied the law of contributory negligence as it pertains to negligence actions generally.[4] In any event, the ruling was incorrect.
In my opinion, error crept into the case at a very early stage of the proceedings when Hahn was dismissed from the action as a defendant, joint tortfeasor.[5] Notwithstanding the dismissal, the issues of contributory negligence (of Hahn) and causation consumed by far the major portion of trial time. The subsequent jury instruction that declared "plaintiff Hahn" and "contractor Hahn" as one and the same entity, and that the negligence of "contractor Hahn" is the negligence of "plaintiff Hahn," is erroneous as a matter of fact and law.
*162 My second major concern with the majority opinion is that it fails to recognize the aforementioned erroneous rulings. Hahn is a corporation and as such is a wholly separate entity from Fashion Place Associates, a limited partnership. Hahn is merely one of its general partners and is not the plaintiff here at all. Fashion Place Associates is the actual plaintiff, Hahn merely having brought the action for and on behalf of the limited partnership as one of its general partners.[6]
Fashion Place Associates, as owner, lawfully contracted with Hahn[7] and others for the erection of a structure that it was entitled to receive reasonably free from defects. The combined negligence of those responsible for design, fabrication of materials, and construction has occasioned a loss through no apparent fault attributable to the owner.[8] Fashion Place is therefore entitled to present its case against both Hahn and Armco covering its damage claims over and above the sums previously paid in compromise. Consequently, I would reverse and remand with instructions to reinstate Hahn as a party defendant and that the issues of liability and damage be tried against both Hahn and Armco, as joint tortfeasors.
NOTES
[1] A live load is the load, in addition to the weight of roofing material, that a structure is expected to support  for example, snow.
[2] Mr. Coon detailed other deficiencies in the non-collapsed area which included: (1) Many bolts were never installed connecting the girders and columns. At one major connection a girder had dropped three-quarters of an inch because only two bolts had been installed where the plans called for eight bolts. (2) Bolt holes on the structural members did not line up in many instances. In one case one of the workers had welded the girder to the cap plate, and then, to make it look as though bolts had been installed, he cut the shank off the bolt and put it up into the hole and tack welded the bolt head to the underside of the flange. (3) Nearly half of the bolts installed in the non-collapsed area were loose enough to turn by hand. (4) Many bolts in the mall were too short and did not project through the full thickness of the nut. (5) In violation of the plans and specifications and the standard of practice, many bolt holes were burned to make them larger so they would align with one another. The Pittsburgh Testing Laboratory which inspected the structure after the collapse occurred, reported that "... 80% of the column and spliced plate connections have one or more burn holes." (6) In many locations reinforcing steel was left out of concrete walls which supported steel girders.
[3] The District Court read in the instructions to the jury, in pertinent part, the following:

Armco Steel Company denies liability for any damages that plaintiffs claim to have sustained as a result of the collapse of the Mall on December 29, 1972. It is agreed and stipulated, however, that if the appropriate witnesses were called, they would testify that the following expenses [of $1,493,947.20] were incurred by plaintiffs and that said expenses were reasonable for the services or labor performed and materials furnished. Armco Steel Company, however, denies liability for said amounts on the grounds that (1) they were not incurred as a result of any acts, or any breach of warranty, on the part of Armco, or (2) they were not a necessary expense resulting from the collapse, or (3) they are not appropriate items of damage for which plaintiffs are entitled to recover under the facts and circumstances of this case. During the trial Armco made a further stipulation in open court that if appropriate witnesses were called, they would testify that the $470,000 paid by plaintiff to tenants to settle claims was both reasonable and necessary as a result of the collapse.
[4] Although this Court has never before clearly accepted or rejected the strict products liability doctrine, the Tenth Circuit Court of Appeals, applying the Erie doctrine, has held on four separate occasions that we would likely adopt strict liability in Utah: Smith v. Clayton and Lambert Mfg. Co., 488 F.2d 1345 (10th Cir.1973); Julander v. Ford Motor Co., 488 F.2d 839 (10th Cir.1973); McGrath v. Wallace Murray Corp., 496 F.2d 299 (10th Cir.1974), and Shuput v. Heublein Inc., 511 F.2d 1104 (10th Cir.1974).
[5] If it is determined that the product was in a safe condition when it left the seller, then it appears to us that the seller could  under no circumstances  be liable to the user as the latter would have failed to prove (which is his burden) unreasonable danger of that product to him. Technically, in such a situation misuse does not appear to be a true affirmative defense. However, if there is a situation where the product is unreasonably dangerous and also there is misuse by the user, accompanied, of course, by concurrent proximate causes, a true defense would lie by the seller.
[6] In accord with this principle of assumption of risk are Williams v. Brown Mfg. Co., 45 Ill.2d 418, 261 N.E.2d 305 (1970); McCarty v. F.C. Kingston Co., 22 Ariz. App. 17, 522 P.2d 778 (1974); Collins v. Musgrave, 28 Ill. App.3d 307, 328 N.E.2d 649 (1975); Kirkland v. General Motors Corp., Okl., 521 P.2d 1353 (1974); Findlay v. Copeland Lumber Co., 265 Or. 300, 509 P.2d 28 (1973); Keener v. Dayton Electric Mfg. Co., Mo., 445 S.W.2d 362 (1969).
[7] Various terms are used to describe this recently developing concept including "comparative negligence," "comparative fault," "comparative cause," "equitable apportionment or allocation of loss," etc., when defenses to strict products liability are invoked.
[8] See Daly v. General Motors Corp., 20 Cal.3d 725, 144 Cal. Rptr. 380, 575 P.2d 1162 (1978) for an excellent and spirited argument between Justice Richardson (in the majority opinion, which was for application of comparative fault as it would be more elevating to "justice and equity" to apply it) and Justice Mosk (in a dissenting opinion, which opposed this application in favor of "[T]he pure concept of products liability ... .")
[9] Prosser, The Assault Upon the Citadel, 69 Yale L.J. 1099 (1960); Epstein, Products Liability: Defenses Based on Plaintiff's Conduct, 1968 Utah L.Rev. 267.
[10] Ultramares Corp. v. Touche, 255 N.Y. 170, 180, 174 N.E. 441, 445 (1931).
[11] Prosser, Law of Torts (4th ed. 1971), Sec. 96, pp. 657-658.
[*] Retired Justice Ellett continues to act on this case at the request of the Court.
[1] This is consistent with our present codification of the law which expressly limits strict liability claims against manufacturers. U.C.A., 1953, 78-15-1, et seq.
[2] As evidenced by the $825,000 compromise reached with all tortfeasors other than Hahn (the contractor) and the sole remaining defendant here, Armco.
[3] The jury also found liability on the theories of strict liability and implied warranty.
[4] Utah has since adopted the concept of comparative negligence by statute. See U.C.A., 1953, 78-27-37 to 43, effective May 13, 1973.
[5] The motion to dismiss as against Hahn was granted prior to trial over strenuous objections and without any determination of liability.
[6] Neither the statutes nor the rules of procedure authorize a partnership to bring an action in its own name.
[7] A partnership can properly contract with one of the partners. Prows v. Hawley, 72 Utah 444, 271 P. 31 (1928).
[8] The argument that Hahn's negligence is vicariously attributable to Fashion Place due to their relationship is without merit because of Hahn's status as an independent contractor. Dowsett v. Dowsett, 116 Utah 12, 207 P.2d 809 (1949).