James D. CARROLL and Darrell Mack COX
*v.* STATE of Arkansas

CR 82-37                                           634 S.W.2d 99

Supreme Court of Arkansas
Opinion delivered May 24, 1982
[Rehearing denied June 28, 1982.]

*Lessenberry & Carpenter,* for appellants.

*Steve Clark,* Atty. Gen., by: *Victra L. Fewell,* Asst. Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. At about three o'clock on the morning of January 19, 1981, the appellants Carroll and Cox, truck drivers, drove a large tractor-trailer rig onto the scales of a state weigh-station near Hope. On that particular night shift the station was being manned by Charles Caldwell, a state employee with five years' experience at his job. Caldwell's examination of the bill of lading and other documents submitted to him by Carroll disclosed various discrepancies and omissions that led within an hour or so to an inspection of the contents of the trailer by three administrative officers. The trailer was found to contain not less than 248 large bales of marihuana, having a street value of well over a million dollars. This appeal results from a jury trial at which both defendants were found guilty of possession of marihuana with intent to deliver. Carroll was sentenced to ten years' imprisonment; each defendant was fined the maximum of $10,000. The Court of Appeals certified the case to us as presenting an issue of statutory construction. Rule 29 (1) (c).

The three points for reversal question the validity of the inspection of the trailer, the extent to which the prosecution was permitted to cross-examine Carroll at a suppression

hearing, and the trial court's ruling that a proffered defense witness was not qualified to testify as a handwriting expert.

First, the validity of the inspection. The Motor Carrier Act of 1955, Act 397, provides that common and contract carriers by motor vehicle, both interstate and intrastate, must be licensed by the Arkansas Transportation Commission. Ark. Stat. Ann. §§ 73-1754 *et seq*. (Repl. 1979). The Act imposes the duty of policing compliance with the statute upon enforcement officers, who have the authority to make arrests. § 73-1760 (c). This language of the statute provides specifically for the inspection of the contents of vehicles reasonably believed by the enforcement officers to be operating in violation of the Act:

> Such enforcement officers upon reasonable belief that any motor vehicle is being operated in violation of any provisions of this Act, shall be authorized to require the driver thereof to stop and exhibit the registration certificate issued for such vehicle, to submit to such enforcement officer for inspection any and all bills of lading, waybills, invoices or other evidences of the character of the lading being transported in such vehicle and to permit such officer to inspect the contents of such vehicle for the purpose of comparing same with bills of lading, waybills, invoices or other evidence of ownership or of transportation for compensation. [§ 73-1760 (c).]

The proof shows overwhelmingly that the enforcement officers had grounds for a "reasonable belief" that the appellants' rig was being operated in violation of the act. At the weigh-station Carroll submitted as his authority for driving the rig a lease from Maislin Transport of Delaware, but the lease was for a Kenworth tractor instead of the White tractor the defendants were driving. Their log books were not current, for which Carroll was placed under arrest. (The other appellant, Cox, fled soon after the vehicle was stopped and was later picked up by the police at a motel in Hope.) The bill of lading produced by Carroll was handwritten instead of the usual typing, indicated that the shipment originated in Michigan (Carroll testified at the suppression

hearing that he picked up the load in Houston) but gave only a street address for the consignee, with no city being named, did not describe the commodity being carried except as "50 pieces 12x100," and contained other defects that led Caldwell to radio for assistance from another state employee, Richard Birtcher, who arrived within ten minutes. He in turn called in a third enforcement officer, George Hamilton, who was patrolling in the vicinity. Birtcher believed, we think correctly, that he had the authority under the statute to inspect the contents of the trailer. Carroll professed not to know what was in the trailer and did not have a key to the lock on its doors; so the officers cut the lock and discovered the marihuana. We find no basis for questioning the validity of a routine inspection that turned up an unsuspected but huge quantity of drugs.

Defense counsel make no attack upon the inspection as such, but they elect instead to treat the examination of the trailer as a "search" for which a search warrant is required. No authority is cited for the implication that officers must obtain a search warrant for a routine inspection of a vehicle which they reasonably believe to be operated in violation of the Motor Carrier Act. That act is not essentially a criminal law. Its violations are punishable either by civil penalties or by fines for misdemeanors only. § 73-1775. Officer Birtcher testified: "The attorney keeps referring to a search. I never one time stated to this driver that I was going to search his truck; I was merely making a regular, routine transportation inspection of the vehicle."

Even if a search had been involved, two of the three officers testified that Carroll gave permission for the inspection and said he did not care if they cut the lock (his testimony being that he did not know what the contents were). The third officer, Birtcher, was in the scale-house office when the permission was given, but he explained: "I don't recall it. I was in the same area. I was either in the kitchen getting a cup of coffee, at the scales, or on the phone or something." The proof is convincingly clear that Carroll consented to the inspection, or to the search if it be so regarded. Finally, Carroll was not placed under arrest for having a spurious bill of lading (which he admits he had)

until the inspection had revealed the contents of the trailer. Thus the inspection accomplished its proper administrative purpose. That a criminal prosecution resulted does not vitiate the procedure or invalidate the statute.

Second, Uniform Evidence Rule 104 provides that an accused, by testifying about a preliminary matter, does not subject himself to cross-examination as to other issues in the case. At the hearing on a motion to suppress evidence about the discovery of the marihuana, Carroll testified on direct examination that he did not know the trailer contained any marihuana and thought it contained a load of plastic (even though he had picked up the locked trailer in Houston rather than in Michigan, as the spurious bill of lading recited). On cross-examination the prosecutor questioned Carroll about his knowledge of governing regulations and similar matters going to his awareness and credibility. Defense counsel objected to question after question, as not being pertinent to the motion to suppress. The credibility of the witness, however, *was* pertinent. Moreover, neither in the brief nor in the oral argument before this court have counsel pinpointed even one solitary fact that was improperly brought out by the cross-examination. In view of the total want of any showing of prejudice, the argument that the cross-examination so tainted the case that it should be reversed and dismissed does not warrant serious discussion.

Third, the trial judge ruled that a proffered defense witness, John Scott, was not qualified as a handwriting expert (to testify, according to a proffer of proof made after the jury had begun its deliberations, that neither defendant had filled in the spurious bill of lading). We have often held that the determination of an expert witness's qualifications lies largely within the discretion of the trial court and have sustained the trial judge's rejection of a proffered expert who "was unable to cite any training or experience that clearly qualified him as an expert with respect to the question at issue." *United States Fidelity & Guaranty Co.* v. *Smith*, 252 Ark. 556, 480 S.W.2d 129 (1972). The same reasoning is applicable here.

Scott, a resident of Cherokee Village, said he had lived in Arkansas for eleven years. Asked about his occupation, he answered: "I am a certified graphoanalyst, which in common terms is a handwriting expert." He had taken a correspondence course from the International Graphoanalysis Society of Chicago, which had certified him. His training consisted of studying the various mechanics of handwriting, the slant, unusual markings in the strokes, pressure brought to bear on the paper, and other basics that make up handwriting. In his twelve years of alleged experience "in questioned document work" he had testified as an expert only once, in Clinton, Iowa, and had "worked with" law enforcement officers in two Arkansas counties, but the cases did not come to trial. He had written "daily columns for our weekly newspaper" and had taught short courses on graphoanalysis. He was not a member of the Academy of Forensic Science.

The term "graphoanalysis" was apparently coined by the international society, because it is not to be found in Webster's Second or Third New International Dictionaries, the Random House Dictionary, the American Heritage Dictionary, Webster's New World Dictionary, or West's Words & Phrases. Scott indicated that graphoanalysis is an aspect of graphology, the original form of handwriting analysis, "which borders on the occult," but "graphoanalysis is much more scientific." He never did say, however, just what graphoanalysis is. Graphology, which is the study of handwriting as it reveals character and personality traits, is examined at length in the article on handwriting in the Encyclopaedia Britannica (1965). According to that article, graphology is based on the study of the mechanics of handwriting (which Scott studied in his correspondence course). It is intended primarily to relate handwriting to personality traits, but some of its advocates have also used it to predict and diagnose liver and heart disease, cancer, accident proneness, numerous psychiatric categories, and tuberculosis. The article concludes: "The question of the ultimate scientific value of graphology is unanswered." The Britannica also mentions graphology under Fortunetelling.

Our point is simply that there is nothing in the article on graphology and very little in Scott's discussion of graphoanalysis to indicate that either has any connection with comparing handwritings to determine authenticity. Scott did testify that he had read books on forensic document work, but his practical training and experience in that field have not, as we said in *U. S. F. & G., supra,* "clearly qualified him as an expert" to testify about the authenticity of a questioned document.

Apart from Scott's lack of qualifications to give expert testimony, the question whether either Carroll or Cox filled in the bill of lading is not of any real importance in the case. Neither is charged with forgery. Carroll freely admitted that the bill of lading was spurious, a fact not open to the slightest doubt. Who made it out is not a critical issue. Thus the third point for reversal is primarily of academic interest only.

The case for the jury was simple. A routine administrative inspection of the defendants' cargo revealed it to include a huge quantity of marihuana, a contraband drug, concealed by surrounding cartons of plastic. Carroll insisted all along that he knew nothing about the million-dollar cargo that had been entrusted to him in Houston by a Mr. Rivera, otherwise unidentified. The defendants put the State to its burden of proving guilt, as they were at liberty to do. After a fair trial the jury resolved the only real issue of fact, whether the defendants knowingly possessed the marihuana. The sufficiency of the evidence to support the verdict is not questioned.

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. Neither the Arkansas General Assembly nor the Supreme Court of Arkansas has the power to invalidate the 4th and the 14th Amendments to the Constitution of the United States of America. The majority opinion, it seems to me, has attempted to either annul or circumvent the provisions of those Amendments. The court cannot contravene the United States

Constitution through the use of misnomers. That is precisely what the majority opinion has attempted to do by substituting the word "inspection" for "search." A rose by any other name smells the same.

The locked cargo trailer, a part of an 18 wheeled rig, was parked alongside the highway and a number of law enforcement officers were present and in total control of the situation. There is absolutely no reason why these officers could not have obtained a search warrant for the cargo trailer, even if they had to wait a few hours. The cargo was secured and in the safe keeping of the officers and the driver had already been arrested and placed in custody. The actual reason for failing to obtain a search warrant pursuant to the 4th Amendment to the Constitution was summed up by the transportation officer's statement that they had authority under the Arkansas Motor Carrier Act, Ark. Stat. Ann. § 73-1754 *et seq.* (Repl. 1979), to search the cargo compartment. It is one of our most fundamental principles of government that a state statute cannot override the Constitution. If the officers had probable cause to believe the cargo trailer contained contraband then a search warrant was required before cutting the lock from the container compartment. Richard Birtcher stated, as he was breaking the lock from the cargo container, that he "didn't have any idea what was inside the sealed unit."

The answer to the Constitutional question is clearly resolved in Article 6 section 2 of the Constitution of the United States which states:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding.

The above quoted language from the Constitution needs no further explanation in relation to the facts in the case before us. Today we authorized the breaking into a person's sealed trailer without benefit of a search warrant. Tomorrow we

may authorize breaking off a lock from the front door of a citizen's home if it is suspected he has contraband therein.

The majority opinion relating to the qualifications of John Scott is most amusing. They boldly assert that John Scott was not an expert, indicating in the process that there is no particular value to the art of graphology. Yet, the majority opinion clearly sets out enough qualifications and credentials to indicate that John Scott was qualified to testify as an expert. It is my opinion that John Scott's testimony should have been admitted pursuant to Uniform Rules of Evidence, Rule 702. His testimony could have been tested by the state pursuant to Rule 703.

I still believe in a strict construction of the Constitution of the United States and submit that the search and seizure as conducted in this case clearly violated the 4th Amendment.