492 So.2d 948 (1986)
James L. HOOTEN
v.
STATE of Mississippi.
No. 55563.
Supreme Court of Mississippi.
May 7, 1986.
Rehearing Denied August 27, 1986.
Merrida P. Coxwell, Jr., Stanfield, Carmody, Coxwell & Creel, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Leyser Q. Morris, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and DAN M. LEE and SULLIVAN, JJ.
PATTERSON, Chief Justice, for the Court:
This is an appeal from James L. Hooten's second conviction of murder by a jury in September, 1983. We reversed and remanded Hooten's first conviction in Hooten v. State, 427 So.2d 1388 (Miss. 1983).
The facts surrounding the murder of Reuben Wood are reported in our previous opinion cited above, and need not be restated here. For purposes of this appeal, we focus on the fact that a legal writing pad was found near Reuben Wood's body when he was discovered on the morning of November 4, 1977.
The State sought to place Hooten at the scene of the crime by proving the legal pad found next to the body had Hooten's handwriting on it. To support their theory the State produced a special agent with the FBI assigned to the document section of the federal laboratory. He came to the conclusion the legal pad contained Hooten's handwriting.
To rebut this testimony, defense counsel called Marie B. Hill to testify as an expert in handwriting analysis. After a thorough voir dire on her qualifications, the trial court determined she lacked the educational background to testify in an expert capacity. Defense counsel proffered her testimony, and the record reveals Mrs. Hill came to the opposite conclusion. As a result of this exclusion, the State's evidence establishing Hooten's presence at Reuben Wood's trailer was uncontradicted.
We are of the opinion the refusal of the trial court to allow Mrs. Hill to testify as an expert was error.
This issue has heretofore been decided by this Court. In Henry v. State, 484 So.2d 1012 (Miss. 1986), we reiterated our well established rules regarding expert witnesses, and stated, "It is not necessary that one offering to testify as an expert be infallible or possess the highest degree of skill; it is sufficient if that person possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman. (Cites omitted.)" 484 So.2d at 1015.
In this case, as in the Henry case, Mrs. Hill's testimony was the only challenge to the State's expert placing Hooten at the scene of the crime. Her practical experience in the examination of questioned documents, and frequent court appearances to testify in similar cases places her clearly *949 within the ambit of our rules regarding experts. We emphasize that in situations such as this, attacks on the expert's qualifications and methods are better directed toward the weight of the testimony than its admissibility. Henry v. State, supra.
REVERSED AND REMANDED FOR A NEW TRIAL.
WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
HAWKINS, Presiding Justice, dissenting:
I would sustain the petition for rehearing, withdraw the original opinion in this case, and affirm.
The original opinion, relying on Henry v. State, 484 So.2d 1012 (Miss. 1986), held that it was error for the circuit court to exclude Marie B. Hill as a handwriting expert qualified to express an opinion on whether or not certain handwriting was the defendant's.
In my view the original opinion did not address the precise issue with which we as an appellate court are concerned. The question is not whether the circuit court "committed error," as we then stated, but whether the court abused its discretion in refusing to permit this witness to testify as an expert on the authenticity of handwriting.
Since the determination of whether or not a particular witness possesses the necessary qualifications to qualify as an expert is addressed to the sound discretion of the trial court, and as I hope to demonstrate there was no abuse of discretion in this case, I would affirm this case.

THE BASICS
Let us begin with some basics. First, what is an expert?
In Capital Transportation Co. v. Segrest, 254 Miss. 168, 181 So.2d 111, 120 (1965), we stated:
[I]t is generally sufficient if a witness possesses knowledge peculiar to the matter involved not likely to be possessed by the ordinary layman.
In Gulf, Mobile & Ohio Railroad Co. v. Hollingshead, 236 So.2d 393, 396 (Miss. 1970), we stated:
Generally to qualify as an expert witness, one must have acquired special knowledge of the subject matter about which he is to testify, either by the study of recognized authorities on the subject or by practical experience.
And, in Ludlow Corp. v. Arkwright-Boston Mfrs. Mut. Ins. Co., 317 So.2d 47, 50 (Miss. 1975), we added to the requirement that such witness by his special knowledge be able "to give the jury assistance and guidance in solving some problem which jurors are not able to solve because of their own inadequate knowledge." See: Early-Gary, Inc. v. Walters, 294 So.2d 181, 185 (Miss. 1974); and Hardy v. Brantley, 471 So.2d 358, 366 (Miss. 1985), where we noted Rule 702 of the Mississippi Rules of Evidence is consistent with our established rule regarding the qualifications of an expert. This Rule states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
We have also held that the determination of whether a witness has obtained the required degree of specialized knowledge within a particular field to qualify as an expert is a matter within the sound discretion of the trial court. Illinois Cent. R. Co. v. Benoit Gin Co., 248 So.2d 426 (Miss. 1971); Early-Gary, Inc. v. Walters, supra; Gulf Ins. Co. v. Provine, 321 So.2d 311 (Miss. 1975); Parmes v. Illinois Cent. Gulf R.R., 440 So.2d 261 (Miss. 1983); Byrd v. F-S Prestress, Inc., 464 So.2d 63 (Miss. 1985); Hollingsworth v. Bovaird Supply Co., 465 So.2d 311 (Miss. 1985). In Hardy *950 v. Brantley, supra, we gave the following caveat:
Suffice it to say that the trial judge should seek to assure that the proffered witness really is an expert in the area in which his opinion testimony is offered. [Emphasis added]
471 So.2d at 366.

MEANING OF DISCRETION
Although there have been countless times when this Court has used the word "discretion" in one context or another, I have been unable to find any case in which we have attempted to give its meaning.
Reflecting a moment, when we say a court has discretionary authority to say yes or no to a particular question, we must acknowledge it is a question as to which there can be honest disagreement between equally intelligent individuals. If the answer to the question is never uncertain, or never subject to any doubt, there would be no need to vest a court with discretionary authority in its answer.
Yundt v. D & D Bowl, Inc., 259 Or. 247, 486 P.2d 553 (1971), makes the following observations:
When faced with an offer of proof, which may or may not be appropriate for jury consideration, the trial judge may, in certain circumstances, either admit or exclude the proffered testimony if he applies the correct principle of law and does not abuse his discretion.
* * * * * *
Discretion ... is a very slippery concept... . It occurs in a hundred forms in the trial judge's day-to-day work, bobbing up in every state and in every court. Yet the legal literature does not analyze, define or account for it in any coherent fashion. Neither do the decided cases. They bandy the terms "discretion" and "abuse of discretion" incessantly, but not helpfully. Indeed, it is hard to think of a subject of comparable sweep in the law that has suffered as much neglect. [486 P.2d p. 558]
* * * * * *
The decision of the trial judge is legally valid so long as that decision is based on a proper application of a rule of law to the facts involved.
State v. Winne, 21 N.J. Super. 180, 91 A.2d 65, 78 (1952), states:
Judicial discretion is the option which a judge may exercise between the doing and not doing of a thing which cannot be demanded as an absolute legal right, guided by the spirit, principles and analogies of the law, and founded upon the reason and conscience of the judge, to a just result in the light of the particular circumstances of the case.
In State Ex Rel. Simpson v. Vondrasek, 203 Neb. 693, 279 N.W.2d 860, 864 (1979), the Supreme Court of Nebraska stated:
In a broad sense, "judicial discretion" is the option which a judge may exercise either to do or not to do that which is proposed to him that he shall do; choosing between the doing and not doing of a thing, the doing of which cannot be demanded as an absolute right of the party asking it to be done; the exercise of the right legally to determine between two or more courses of action.
The Court then quoted the pragmatic definition given by Maurice Rosenberg of Columbia University Law School:
Judicial discretion is a limited right to be wrong in the eyes of the appellate court and still not be reversed.
279 N.W.2d at 865.
In People v. Craver, 174 Misc. 325, 20 N.Y.S.2d 533 (Sup.Ct. 1940), the New York Supreme Court stated: "This Court is careful not to substitute its own discretion for the discretion invested in the trial court."
Our inquiry, then is not whether the circuit judge ruled contrary to what one of us might have ruled, not whether he was "right" or "wrong" in our view, but whether he abused his discretion. And, unless the trial court based his decision on an erroneous view of the law, Bell v. City of Bay St. Louis, 467 So.2d 657, 661 (Miss. 1985), we are not authorized to reverse for an abuse of discretion unless we find it was *951 "arbitrary and clearly erroneous." Weiss v. Louisville, N.O. & T. Ry. Co., 7 So. 390 (Miss. 1890).

MARIE B. HILL
Hill's formal education went no further than high school. She had done some secretarial work in a chancery clerk and law office. While a housewife, and going to school at night studying typing, bookkeeping and secretarial work, she also took a correspondence course with the "International Graph-Analysis Society Institute" in Chicago, finishing an eighteen-month course of 20 lessons in approximately nine months to a year, she said.[1] She had also obtained a "Master's Degree" from this same institution by taking further correspondence courses, the length of which she did not state. The "Institute" teaches entirely by correspondence courses.
When she finished her course, for a fee they permitted her to go a graduation in Chicago, wear a cap and gown, and attend all the festivities. There she first met her "professor."
According to her, "grapho analysis" is "the art and science of handwriting analysis," and "personality characteristics are the first thing you learn." Her "Master's Degree" was in this field, not in examining questioned documents.
To make character analyses, she uses two instruments, a "slant gauge" and a "perspectograph." The first instrument measures the slant in handwriting from which "physical and mental" pressure could be determined. As to the perspectograph:
It more or less compiles what you get with the other instrument. You take it, and it is more like a little rule about so long; and you take the number of times that you find a slant and put it in different places on this thing and come up with more of a graph like thing that tells you how that person reacts. [Record, p. 825]
According to her, handwriting is a reflection of what is on a person's mind, and she analyzed this.
She testified as follows:
Q. Oh, you call yourself a handwriting expert; is that right?
A. I'm qualified as one through the International GraphoAnalysis Society, and I hold a membership in that organization. And they will back up or re-examine  If you question what I do, you can send it to them and they will check it out and tell you if I'm right or wrong.
* * * * * *
Q. How did you get interested in this handwriting?
A. I had a sister that was married to a doctor in Pennsylvania. And got a hold of it from somewhere and introduced it to me. And I thought I would love it.
This correspondence course was all the training she had received.
Q. And you have no other training other than your correspondence courses that you took; is that right, a handwriting identification and questioned documents?
A. That's the only way to get it.
She completed her correspondence course approximately fifteen years prior to this trial.
The only reference she uses when examining documents are her dictionary or some book published by her alma mater.
She was asked:
Q. Did you study Graphology or Grapho-Analysis?
A. I don't know anything about Graphology. I don't even know the definition of it really. I just know that it is not Grapho-Analysis.
Asked if she had attempted to learn anything new about the field of handwriting examination, she replied:

*952 A. I don't intend to. I feel like what I know is sufficient for the amount that I intend to do. I don't intend to overstep my bounds in the examination. When it gets past what I can do, then I will turn it over to somebody with a higher education.
She knew nothing about Ardway Hilton, the author of The Scientific Examination of Questioned Documents.
She knew nothing about Conway on Evidential Documents.
She knew nothing about Wilson R. Harrison, the author of Suspect Documents.
As to another eminent authority, Albert Osborn, Hill thought she knew him, and also believed he had gone to the grapho analysis school just as she had, and written a book about it which made him rich. But, she added, "I don't know if he knows any more about it than I do."
Hill testified she had been a witness some 300 times in court around this state.
At county fairs, malls and shopping centers there are "handwriting computers" which take specimens of handwriting and instantly render statements concerning the personality of the writer.
As to these machines, we have the following colloquy between Hill and the state's counsel:
Q. Do you know those program computers they have out at the fair?
A. Yes.
Q. One where you stick a card in there and it 
A.  I used one of them.
Q. You used one. They analyze your handwriting, don't they?
A. It's pretty good, too.
Q. They do about the same thing you do, don't they?
A. As far as they go.
The state's handwriting expert was Robert B. Hallett of the Federal Bureau of Investigation. Hallett received a Bachelor of Arts Degree from New Jersey State College in Trenton, and thereafter was an elementary school teacher and high school coach for ten years. During this time he taught students penmanship.
He had been an agent with the FBI for fifteen years. For his first five years he was a field agent, following which he was sent to the Federal Bureau of Investigation Laboratory in Washington.
He received three years' training in the discipline of examining questionable documents. This consisted of attending regular classes, reading prescribed books, articles and pamphlets, and taking regular tests. At the time of trial he was on a master's program in forensic science at Georgetown University. He had testified in over one hundred cases in forty different states. He was a member of the Mid-Atlantic Association of Forensic Scientists and the Document Examiners' Association in Washington, D.C.
There was no cross-examination as to his qualifications.
While it is beyond dispute, it bears repeating that there is no place in the entire world which equals the FBI Laboratory in Washington in training specialists in the examination of questioned documents.
WHAT IS "GRAPHO ANALYSIS"?
In view of the importance of the function entrusted to the expert witness, it is of great importance that the court carefully scrutinize his qualifications to guard against being led astray by the pseudo learned or charlatan who may purvey erroneous or too positive opinions without sound foundation. The practical exigencies of the situation make it necessary that the trial court be allowed considerable latitude of discretion in making such determination. His ruling in that regard should not be disturbed lightly, nor at all unless it clearly appears that he was in error in his judgment on the matter.
Webb v. Olin Mathieson Chemical Corp., 9 Utah 2d 275, 342 P.2d 1094, 80 A.L.R.2d 476, 481 (1959).
*953 I will concede that we are liberal in this state in permitting a witness with only a modest amount of expertise in a particular field to qualify as an expert witness therein. There is a vast difference, however, between having only a few facts, and having wrong information, on which an opinion is based.
Our discourse should begin with the definition of "grapho analysis." Unfortunately, Webster's 3rd New International Dictionary (5th Ed. 1971), which gives approximately a half million defined words, does not include this word. The 1979 college edition of American Heritage Dictionary and the 1960 edition of Webster's New Twentieth Century Unabridged Dictionary have likewise blundered in omitting the word "grapho analysis" from their covers.
Webster's 3rd New International, does define graphology:
the study of handwriting esp. for the purpose of character analysis (if taken away from fortunetellers...  may yet become a useful handmaiden of psychology  Time.)
"Graph," of course, is the Greek word for "writing," and "ology" or "logia" is Greek for "the study of" or the "science of." We may conclude that "graphology" literally means the study or science of writing. One would ordinarily presume that "grapho analysis" means an analysis of writing.
We need not despair for a more authoritative definition, however, because we have Professor M.N. Bunker's 1972 The Science of Determining Personality by Graphoanalysis. According to him, he is the founder both of the system known as grapho analysis and the International Graphoanalysis Society.
Mr. Bunker does not tell us his educational background, whether he ever attained a college degree or not. He indicates he could have attended some business college, somewhere, and that he was in the military service in World War I. He tells us he mastered seventeen types of shorthand, and studied all types of penmanship.
Quoting from his Preface:
The system of handwriting analysis know [sic] as Grapho Analysis is not to be confused with out-dated graphology. Grapho Analysis is exact, scientific  the result of more than forty-five years of painstaking research. It is a science, now used throughout the civilized world for both pleasure and profit.
What is the basis of the uncanny accuracy of grapho analysis? The answer is STROKES. The revealing factor is the strokes of the handwriting and not the letter formations. It does not matter what language the writing is in  even shorthand reveals the writer.
This book explains how grapho analysis identifies character and personality traits and tendencies.
The book's jacket informs the interested that by paying $10.00 for the book, he may also send in a sample of his handwriting, any sample, and he is guaranteed that it will be analyzed by an expert at the international institute.
Quoting from the table of contents:
CHAPTER ONE  Your Insurance Policy
Grapho analysis gives you protection from chiselers, thieves, heart break and murders. How it started, how it grew up  why you can depend on it.
CHAPTER TWO  You Show How You Feel
Are you a stormy petrol [sic], or a wall of strength? Do you hate and love and then forget? Are you a volcano or an iceberg?
CHAPTER THREE  Do You Think?  How?
Do you think fast or slowly? Are you a learner or merely curious?
CHAPTER FOUR  Your T's Tell On You
Sensitiveness, pride, vanity, purpose or lack of it. The dreamer, the enthusiastic, the independent.
* * * * * *

*954 CHAPTER SIX  Mind vs. Muscles
Startling discovery of the talent of famous muscle men  Charles Atlas; the English Army Sergeant; . ..
* * * * * *
CHAPTER EIGHT  Handwriting Reveals the Famous
Famous Presidents and their wives:
...
CHAPTER NINE  Are You a Criminal Type?
A new look at criminals and what makes them.
* * * * * *
CHAPTER TWELVE  Are Homosexuals Criminals?
Handwriting reveals startling truths about an age old practice. Are homosexuals sick, or criminals?
CHAPTER THIRTEEN  You Can Know People
Somerset Maugham, Cordell Hull, Hon. Frances P. Bolton, ...
CHAPTER FOURTEEN  How It Works
Case histories show how others use grapho analysis as a career, a source of income, prestige and a help to others who are confused or lost jobwise. How to use your knowledge in the family and in business and professional life.
ANSWERS
Answers to the chapter examinations.
Curiosity attracted me to Chapter 12.
Quoting from page 183:
In a class in Hollywood, attended by people from all walks in life, including a priest who had traveled some 3,000 miles to take the week's work, some one in the audience put up a hand. "Can you tell from handwriting if a man or woman is a deviate?"
* * * * * *
From page 184:
My answer was a positive "yes" rather than an evasion of the question.
* * * * * *
However, I should have made my answer to the first question more complete. Handwriting shows homosexuality in some cases and in some it does not. If the writer is conscious that he or she is a homosexual, and is concerned about it it will show up in the handwriting. But if the writer recognizes the situation, and is not bothered by it, or is not worried by what others think, it will not show. It is the mental attitude that shows, not the actual practice of homosexuality.
He further informs us that the handwriting of Oscar Wilde did not reveal he was a homosexual because it did not bother him. On the other hand the handwriting of Lord Alfred Douglas (whoever he was) reveals that he (page 185):
... was a homosexual with a subconscious feeling of guilt, and it is the fear or guilt feeling in his mind that created the evidence in his writing. However, there is one indication that shows a possibility of the existence of homosexuality. When lower loops are made as square circles, very small, the writer may be married, and have a half dozen children, but the basic inclination was [sic] present, and has never been aroused.
Plates 127 and 128 in Professor Bunker's treatise give us samples of Wilde's and Douglas's handwriting, respectively.
His observations continue on page 190:
This ends the correction to the statement I made so many years ago. Handwriting does reveal a homosexual nature but only under certain conditions. All homosexuals do reveal the homosexuality in their handwriting when the handwriting is in the hands of a professional analyst. It does not show to the layman, except by the repeated presence of the small to tiny squared loops at the ends of down strokes in "g", "y", "j". This is an indicating sign, not conclusive proof, and when you find it, do not rush off madly and assert that So-and-So is a homosexual for, if you do, you may easily get yourself embroiled in legal difficulties out of which it may be costly to escape.
Some of the greatest men and women in history have been homosexuals.
Having read this chapter you will not be immodest to declare yourself an expert on detecting homosexuality in handwriting.
*955 Professor Bunker tells us in his questions and answers at the end of chapter 12 that writing with "circles closed with ink and muddy edges on lines" is the "most prominent evidence of strong sex desires." He tells us that "secrecy, muddy writing and letters cramped together" are a "combination of traits" that represent "the most signs of dangerous sex explosions."
In answer to question number 4, "Would the combination of heavy muddy domineering and compressed writing be dangerous?", he gives an emphatic YES.
In chapter 13 Professor Bunker discusses the handwriting of famous people. Indeed, the noted author W. Somerset Maugham sent him samples of his own handwriting for analysis. Bunkers tells us it revealed Maugham as a great lover of "color," which he demonstrated through "the pictures he painted in words that reached ten thousand times as great an audience as if he had been a Raphael."
Since chapter 13 follows on the heels of chapter 12, and its illuminating dissertation on homosexuals, one can only conclude it was a commendable delicacy on Professor Bunker's part not to also tell us another "secret" he surely could discern from Maugham's handwriting, that he was one of England's most prominent homosexuals of this century.
In his 230-page Grapho Analysis bible, Professor Bunker does not enlighten us as to how forgeries may be detected, although he intimates on page 220 that his book will enable one to do so.
One can only gather Hill got her instruction from this portion of page 220.
Bunker's book contains no bibliography, and cites no medical, psychological or scientific treatise as authority for any of his "scientific" grapho analysis pronouncements.

VALIDITY OF GRAPHO ANALYSIS OR GRAPHOLOGY
Quoting from "Qualification of Examiner of Questioned Documents" from 16 American Jurisprudence, Proof of Facts, pp. 482-483:
Another person who is ordinarily not an expert examiner of questioned documents is the "grapho-analyst," or "graphologist." In the general usage of these terms such persons are those who claim to assess the character or personality of the writer from an examination of his handwriting. This field of inquiry does not fall within the province of the examiner of questioned documents, although the latter, through the study of various national penmanship characteristics and periods of styles in penmanship, can often give an opinion as to the probable national origin or approximate age of the writer.
The examiner of questioned documents is primarily a scientist; he deals with physical facts, and his allegiance is to the scientific method and the scientific ideal rather than to advocacy.
From page 485:
Handwriting identifications is perhaps the phase of document examination most difficult to learn. Handwriting comes in nearly infinite variety. Learning to distinguish class characteristics and individual characteristics in handwriting requires the expenditures of a great deal of time in actually working with handwriting cases under the guidance of an expert. It is not a matter that can be successfully learned by individual study, nor can more than elementary principles be taught in a college classroom. Training in handwriting identification, however long and comprehensive, will be of doubtful value if the trainee does not possess the innate powers of discernment necessary to the proper evaluation of the subtle and minute refinements in individual handwriting characteristics. For this reason, expert document examiners are skeptical of the purported powers of bank tellers and others who make handwriting identifications on the basis of gross variation or on the basis of a list of "class characteristics," *956 which are in fact nothing of the sort. [Emphasis added]
Page 488:
He [the qualified examiner] will invariably have had several years of experience working with and for others in his special field ... He is almost certain to be a member of the American Society of Questioned Document Examiners and will probably belong to other related professional groups, such as the American Academy of Forensic Scientists, the American Society of Criminology, and the like.[2]
I will give observations from two of the leading authorities on questioned documents in this country and England.
Wilbur R. Harrison, Suspect Documents, Their Scientific Examination (1958), page 1:
Most lawyers are aware that there exist certain individuals often loosely referred to as "handwriting experts" or "graphologists" to whom they may refer their problems, but unless he has been unusually fortunate in the past, the more experienced a lawyer is, the less likely is he to place much reliance upon the opinions of the majority of these gentlemen. In the past, not only in this, but in other countries as well, "handwriting experts" and "graphologists" in general have enjoyed a very low status in the courts. The general and usually well-justified feeling has been that their findings are largely intuitive and that consequently there are often as many opinions as there are experts in the case.
Albert S. Osborn, Disputed Documents, 2nd Ed. (1929):
Graphology is one of these pseudo-sciences. It undertakes to determine the varied qualities and attributes of human personality, and even of human character, from handwriting alone. If it could really do what it undertakes to do graphology would in many cases be of great assistance in determining the authenticity or authorship of disputed handwriting. [P. 436]
* * * * * *
Discredit and ridicule are brought upon the subject of graphology by the unfailing tendency of its advocates in their practice and their books to carry their deductions to a ridiculous extreme.
* * * * * *
As a result of long and careful investigation of the claims of graphology and the work of graphologists, and a perusal of practically all the publications on the subject in English and of other works in translation, the definite conclusion is reached that this method of investigation, at least in its present state of development, is of little if any value as an aid in the discovery and proof of the facts in any kind of questioned document inquiry. Not only is this conclusion arrived at but it must be added that the methods and principles of graphology, if faithfully followed, in many instances would undoubtedly lead to error. [P. 438]
* * * * * *
A graphologist rarely if ever testifies in court in America or England, and if one who does testify believes in the subject he usually conceals the fact.
* * * * * *

*957 As practiced at least, this alleged science has no value in identifying the author of a writing, and its exaggerations and unjustified inferences are likely to lead to loose thinking and weakening credulity. [P. 442-443]
Hallett was asked to compare his expertise and that of a graphologist.
I regard it as a comparison of Astrology and Astronomy; Astronomy being a Science, and Astrology being the use of the heavens for a prediction of things to come.
Hallett said he was not a grapho analyst, that he had studied to some extent what they did, and it was primarily an effort to determine personality traits through the examination of handwriting. And, it was also used to determine certain disputed documents.
World Book Encyclopedia makes the following comment under the heading GRAPHOLOGY:
Many of these "grapho-analysis graduates" earned their degree from schools that have no official standing.
* * * * * *
The subject has little academic standing in the United States. Many scholars have called for thorough scientific studies of graphology. But research indicates that graphology probably has limited value for the study of character, health and personality.
As to whether the circuit judge abused his discretion, was clearly and manifestly wrong in excluding Hill, here is what the Arkansas Supreme Court had to say in Carroll v. State, 276 Ark. 160, 634 S.W.2d 99, 102 (1982):
Scott, [when] asked about his occupation, he answered: "I am a certified graphoanalyst, which in common terms is a handwriting expert." He had taken a correspondence course from the International Graphoanalysis Society of Chicago, which had certified him. His training consisted of studying the various mechanics of handwriting, the slant, unusual markings in the strokes, pressure brought to bear on the paper, and other basics that make up handwriting. In his twelve years of alleged experience "in questioned document work" he had testified as an expert only once, in Clinton, Iowa, and had "worked with" law enforcement officers in two Arkansas counties, but the cases did not come to trial. He had written "daily columns for our weekly newspaper" and had taught short courses on grapho-analysis. He was not a member of the Academy of Forensic Science.
The term "graphoanalysis" was apparently coined by the international society, because it is not to be found in Webster's Second or Third New International Dictionaries, the Random House Dictionary, the American Heritage Dictionary, or West's Words & Phrases. Scott indicated that graphoanalysis is an aspect of graphology, the original form of handwriting analysis, "which borders on the occult," but "graphoanalysis is much more scientific." He never did say, however, just what graphoanalysis is. Graphology, which is the study of handwriting as it reveals character and personality traits, is examined at length in the article on Handwriting in the Encyclopedia Britannica (1965). According to the article, graphology is based on the mechanics of handwriting (which Scott studied in his correspondence course). It is intended primarily to relate handwriting to personality traits, but some of its advocates have also used it to predict and diagnose liver and heart disease, cancer, accident proneness, numerous psychiatric categories, and tuberculosis. The article concludes: "The question of the ultimate scientific value of graphology is unanswered." The Britannica also mentions graphology under Fortunetelling.
Our point is simply that there is nothing in the article on graphology and very little in Scott's discussion of graphoanalysis to indicate that either has any connection with comparing handwritings to determine authenticity. Scott did testify that he had read books on forensic document *958 work,[3] but his practical training and experience in that field have not ... "clearly qualified him as an expert" to testify about the authenticity of a questioned document.
In Minnesota v. Anderson, 379 N.W.2d 70 (Minn. 1985), the Minnesota Supreme court was faced with an exclusion of a graphoanalysis personality assessment by the trial court.
The admissibility of a graphological personality assessment is a matter of first impression in this state. "Graphology" is defined in Webster's New Collegiate Dictionary (1977) as "the study of handwriting especially for the purpose of character analysis." Thus, graphological analysis is distinct from handwriting analysis, widely accepted by this court and others as a means to identify a signature as that of a particular signer. Most other jurisdictions that have considered the admissibility of expert graphological personality assessment have excluded it as too scientifically unreliable ... Our review of the scientific literature indicates that the technique of graphology is accorded a low measure of scientific reliability in predicting character or state of mind and is not generally accepted in the scientific fields of psychology and psychiatry. For these reasons, a graphological personality assessment does not meet the standard required for admission of expert testimony ... We hold the exclusion of a graphological personality assessment ... was proper.
Of course, it is a familiar rule in our state that a layman who has become familiar with a person's handwriting may express an opinion as to whether a certain writing is the genuine handwriting of that person. Western Union Tel. Co. v. Goodman, 166 Miss. 782, 146 So. 128 (1933); McCarty v. Love, 145 Miss. 330, 341, 110 So. 795 (1927). Counsel for Hooten did not attempt to offer her in any other capacity than as an expert.
The circuit judge simply ruled Hill did not have the educational background to qualify as an expert witness, and would not permit her to express an opinion as an expert.

CONCLUSION
Can this Court with this background say the lower court judge abused his discretion in so ruling, that he was clearly erroneous?
If this witness has indeed testified over 300 times as an expert on discovering spurious handwriting as she claimed, it is an astonishing indictment on the gullibility of lawyers and judges.
A reading of some of the recognized authorities in the detection of forged documents reveals that it is a very special skill, first requiring some natural aptitude, followed by careful, protracted training over a period of years. When one considers that the FBI requires three years training in regularly attended classes before it permits an officer of its organization to consider himself a specialist in this discipline, you want to pinch yourself to think it was ever possible for this woman to pass herself off in a court as an expert in this particular type of investigation.
Indeed, it takes remarkable ignorance or gall, one or the other, for any lawyer to offer her as an expert on the subject.
One lawyer did his homework and exposed her shortcomings. The circuit judge upheld his motion to exclude her testimony as an expert. They both reflected credit on the administration of justice.
WALKER, C.J., and GRIFFIN, J., join in this opinion.
NOTES
[1] Hill was not quite sure whether or not the answers to all the examination questions were given at the end of her coursebook.
[2] This chapter lists the following as technical references:

Conway, James V.P.: Evidential Documents. Police Science Series. Charles Thomas, 1959.
Harris, John L.: Preparation for Trial From a Document Examiner's Viewpoint. Journal of Forensic Sciences, 1962, 7:351.
Harrison, Wilson R.: Suspect Documents, Their Scientific Examination. Praeger, 1958.
Hilton, Ordway: Education and Qualification of Examiners of Questioned Documents. Journal of Forensic Sciences, 1956, Vol. 1, No. 3, p. 35.
Hilton, Ordway: Scientific Examination of Documents. Callaghan and Co., Chicago, 1956.
* * * * * *
Osborn, Albert S.: The Problem of Proof. Boyd Printing Co., 1950.
Osborn, Albert S.: Questioned Documents. 2nd ed, Boyd Printing Co., 1952.
[3] At least, Scott had tried to read some books on the subject.

Hill never has bothered to read any books on forensic document work, said she did not intend to, and already knew all she needed to know. She thus exemplified the one sure sign of a quack: contempt for recognized authorities.